## GRUBMAN ENGINEERING & MFG. CO., Inc., v. GOLDBERGER.

### No. 147.

Circuit Court of Appeals, Second Circuit.
Jan. 12, 1931.

C. P. Goepel, of New York City, for appellant.

Cavanagh & James, of New York City (Maxwell James, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The reissue patent is for an eye mounting for doll's eyes. The device disclosed is to carry the eye-shells which fit into the eye-sockets of the doll's head and which must be pivoted within it so that the eyes shall close when the doll lies flat and open when it stands upright. Such devices had been very common for years, as every one knows, and the patent was for an improvement in what had gone before. There had been trouble in fitting each shell properly to its socket when both were rigidly fixed upon a bar, because the sockets were not always alike, or the same distance apart, the heads not being precisely uniform. Again, if the shells were pressed close into the sockets while the mounting was being set, they might stick when the doll was moved, so as not to open and close, to the pain of the owner. The device was to remedy these defects.

It consisted of a mounting, pivoted as a whole upon two pins driven into the sides of the head by a wedge member between their inner ends, with cams at its sides. When the wedge was moved vertically the cams drove the inside edges of the pins apart, and their points into the sides of the head. The pins and the wedge then became functionally a single member on which the whole mounting would pivot, a weight attached being heavy enough to overcome any friction of the pointed ends of the pins in the head.

The eye-shells were carried by the same pins, and here lay the advantage of the invention. They were half spheres with the pupil and iris painted upon their convex sides which filled the sockets. Each had opposite holes near the open edge of about the size of the bore of the pins, so that when a pin was put through both holes, it held the shell as part of the mounting, though it could rotate, and move sidewise, upon the pin. When a shell had been so fixed to each pin, the mounting was pressed in place, each shell being set into its proper socket by moving it along the length of the pin, or fixing its angular position. The wedge then drove the pins apart and into the sides of the head and the eyes were in place.

However, if the device had stopped there, the shells would be likely not to move because of the friction between them and their sockets. To avoid this it was necessary to let the shells move backward, so that they should not touch the sockets. This was done by putting upon each pin two circumferential channels the same distance apart as the width of the shell, but nearer its inner end than the places at which the shell rested upon the pin, while the shell was being fitted. As the pin was driven out, the edges in the shell through which it passed, finally came into registry

with the channels, which being of smaller bore than the pin, allowed the shells to fall away from the sockets. Then as the whole mounting oscillated the shells would be free to follow its movement, and the eyes would open and close without touching the sockets.

The defendant's mountings were of two forms. One consisted of a flat central member, on either end of which was another flat member which slid in grooves of the first, being held frictionally at any place. The outer end of each end member had two prongs curved away from the doll's face when the mounting was set in position. On the forward face of the middle member were two upright slabs, each with a deep notch in its top, to carry a bar to which the eye shells were secured, the bar lying loosely in the notches, which acted as journals for its rotation. The shells would themselves rotate on the bar, and could move upon it lengthwise, so as to be adaptable to variations in the sockets. The weight which opened and closed the eyes was attached to the bar, and it moved, carrying the eyes with it, independently of the mounting, which once in place, was rigidly set. To fix the mounting the bar was laid loosely in the notches and the shells pressed into the sockets. They could then be properly set either by rotating to register them vertically, or by moving them along the bar to center them horizontally. After this, a tool was inserted in holes in the outer members of the mounting, or between their ends, which pushed them out and into the sides of the doll's head. If the prongs had been straight, this would result in fixing the mounting at the same distance from the doll's face as when the shells were fitted; there would have been no space between them, and the friction between the sockets and the shells might overcome the weight. The curve of the prongs, however, dropped the mounting as a whole away from the face, as the prongs entered the side walls, and the shells fell away with them, giving the required interval.

The defendant's second mounting was in general like the first, except that a spring was put between the central flat member and the bar which pushed it and the shells towards the sockets. The shells therefore always touched the sockets, but with a pressure measured only by the strength of the spring. In setting the mounting, a tool indirectly pressed the bar, and the bar pressed the shells against the sockets, while the end members were being pushed apart to fix the prongs in the walls. The curve in the prongs dropped back the whole mounting from the face as in the defendant's first mounting. Thereafter, the shells were kept to the sockets only by the tension of the spring, which was not enough to prevent the weight from moving them against the friction so created. It is not apparent that the drop in the mounting was essential to this form, but we do not press this difference.

The claims in suit, nine in number, are excessively abstract and obscure; possibly some of them, if read without regard to the disclosure, may verbally cover the defendant's mountings. This we do not find it necessary to decide, because it is well settled law that a word by word correspondence is not alone enough. Edison v. American, etc., Co., 151 F. 769, 773 (C. C. A. 2); Silver & Co. v. Sternau & Co. (C. C. A.) 258 F. 448, 451; Goodyear, etc., Co. v. Spaulding (C. C.) 101 F. 990, 994. We must have recourse to the specifications to see how far the means there disclosed correspond with those used by the defendant. Westinghouse v. Boyden, etc., Co., 170 U. S. 537, 571, 18 S. Ct. 707, 42 L. Ed. 1136; Westinghouse, etc., Co. v. New York Air Brake Co., 119 F. 874, 884 (C. C. A. 2); Juengst v. Hill Pub. Co. (D. C.) 267 F. 428, 434, affirmed 267 F. 435 (C. C. A. 2).

In detail the two contrivances are wholly unlike, as may be seen at a glance. That, we agree, is not controlling, if the defendant's is no more than an adaptation of the patent; the measure of that latitude is what must decide. In each a three-part mounting is supported by pins or prongs driven into the side walls of the doll's head, by end members driven apart laterally; in each the shells may be adjusted upon the pins or bar; in each they fall away from the sockets after being set; in each they are moved by a weight. The similarities substantially end there. As to the support at the sides of the head by an extensible three-part mounting, Larsen's German patent of 1921 anticipates the patent in suit, though in this the pins apparently do not make their own seats. As to the adjustability of the shells upon the bar, Giebeler-Wanke's patent, 1,319,472, is an earlier disclosure. It also discloses means by which the pressure between socket and shell is greater during setting than in operation. It would perhaps be too much to say that in fixing the shells to the sockets, the compression of the spring, 23, by the plunger, 22, made the bar, shells, sleeve and plunger a solid member, but plainly the disclosure approximates this in result. Marcus in his development (Exhibit B) of his patent, 1,286,045, fixed the side members of his bridge into the walls by prongs.

As to what is left, the means were totally different. The rescission of the shells by the registry of their edges with the channels in the pins was altogether foreign to the drop in the whole mounting effected by the curved prongs. Again the patent made the mounting swivel as a unit on its supports. The defendant allowed only the bar to rotate in its journals, a very old method in the art, and of quite another line of descent, as Judge Campbell observed. Finally, the defendant holds the end members apart by friction, not positively, and friction is as near to Larsen's spring as it is to the plaintiff's wedge. A patentee may indeed monopolize all the uses of his invention, but we must first learn what that invention is. It is not the idea in vacuo; the consideration for the grant is a chart which others can follow, not an intimation they must work out for themselves. If they embody the idea by quite different means, they need pay him no tribute; he gets his reward for marking the path, not for pointing to the goal. So here a doll maker may make the shells fall away from the sockets, if he does so without taking any of Grubman's mechanism or anything near it. The claims may be turgid as one will; they will not prevent this; they may not vaguely threaten the art. The latitude we give does indeed depend upon how far the inventor has stepped forward; he may be a "pioneer." When he is, we stretch his claims to the breaking point. But Grubman was not of this class. The art was cluttered with various devices of this kind, and while that may be the most valid evidence that a new step was invention, when followed by great success, this patent was never used at all. Even if it had been, it did not foreclose others who borrowed nothing from Grubman's media. Such is the situation at bar, and we altogether agree with Judge Campbell in thinking that the defendant did not infringe.

The second patent needs little consideration. It was formally for a method and means of applying mountings to dolls' heads, and the mechanism differed in detail from the first disclosure, though not much in principle. The shells were not mounted upon pins with channels into which they might drop when the pins were pressed out lengthwise. They were on the contrary of uniform bore, but the holes in the shells, through which they passed, were not a snug fit; they were oblong slots which allowed the shells to move to and from the sockets. In setting the mounting, the tool used pressed the shells against the pins so that the rear of the slots touched them. After the pins had been driven into the side walls, the tool was taken away, and the shells were free to drop back by the length of the slots, being held, however, against the sockets by light springs whose ends abutted on opposite edges of the shells, and whose center bore against the frames which held the pins.

This very complicated device, which was also a failure, was as far removed from the defendant's mountings as the reissue patent. It was an ingenious invention, and amply justified a patent, but it can make no claim to wide comprehension. Its claims also were in general like those of the reissue; though verbally they could be read upon the defendant's mountings, this becomes possible, if at all, only when we throw aside the disclosure altogether and generalize the invention beyond anything to which it is entitled.

Decree affirmed.