## GENERAL ELECTRIC CO. v. PARR ELECTRIC CO., Inc.

No. 7457.

District Court, E. D. New York.

Aug. 6, 1937.

472

Stephen H. Philbin, of New York City (Harrison F. Lyman, of Boston, Mass., A. G. Prangley, of Schenectady, N. Y., and Edgar H. Kent, of Newtonville, Mass., of counsel), for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (Lawrence C. Kingsland, and Edmund C. Rogers, both of St. Louis, Mo., of counsel), for defendant.

CAMPBELL, District Judge.

This suit is brought by the plaintiff for the alleged infringement by the defendant of (1) patent No. 1,957,237, issued to Walter L. Upson, assignor, to General Electric Company, for Fan Blade, granted May 1, 1934, on application filed January 20, 1932; (2) design patent No. 89,076, issued to Joseph W. Gosling, assignor, to General Electric Company, for design for an electric fan, granted January 24, 1933, on an application filed December 1, 1932.

The title of the plaintiff to the patents in suit is admitted and the sale by defendant, Parr Electric Company, Inc., of the types of fans charged to infringe, within this district, subsequent to the granting of the patents in suit, and prior to the commencement of this suit, is also admitted.

The alleged infringing fans were manufactured by the Emerson Electric Manufacturing Company of St. Louis, and that company is defending this suit in behalf of Parr Electric Company, Inc., its customer, and references hereinafter made to "defendant" are to be understood as referring to the Emerson Electric Manufacturing Company, unless otherwise indicated.

With reference to the type of fans known as the "Silver Swan" defendant is charged with infringing claims 8, 9, and 17 of the Upson patent, and with infringement of the Gosling design patent.

With reference to the type of fans known as the "Lindberg," the defendant is charged with infringing claims 7 and 14 of the Upson patent; but plaintiff in this suit relies only on claim 7, and does not think that claim 14 adds anything of importance to claim 7.

The original bill of complaint was filed in December, 1934, and was directed against the "Silver Swan" fan. Subsequently the Emerson Electric Manufacturing Company began to manufacture, and the Parr Electric Company, Inc., to sell, fans of the "Lindberg" type, and in September, 1935, plaintiff filed a supplemental bill directed against this type of fan.

I will discuss the case with reference to each of the said patents in the order hereinbefore named.

### The Upson Patent 1,957,237.

The patent says: "My invention relates to fans and more particularly to fan blades." Page 1, lines 1 and 2.

In the following paragraph the patent mentions many types of fans to which the present invention is directed; viz., theater auditorium fans, air conditioning apparatus fans, blowers and air circulating fans, home fans, furnace fans, ventilating fans for winter as well as summer, kitchen fans, and fans used with electric refrigerators.

Although it is true that the "Silver Swan" fan and the "Lindberg" fan are desk fans, the fan of the Upson patent in suit as has been shown was not limited to desk fans, and this appears from the testimony of plaintiff's witness Peters. This further appears from the fact that the plaintiff company has licensed two companies under the Upson patent in suit; one to use the patent on "free air fans," and both specifically to use the Upson patent in suit in fans "other than free air fans." Obviously the plaintiff intended to have the patent used for every type of fan.

As broad as is the patent, so broad may be the prior art cited against it from the same fields.

The patent then proceeds in the next paragraph to state the object of the invention as follows: "The object of my invention is to provide improved blades for fans which will make them comparatively quiet in operation and yet make them comparable in the velocity imparted to the air, the velocity distribution, and the efficiency of operation with standard fans." Page 1, lines 38–43.

The fan is shown as having three wide blades, which, together, occupy substantially the full desk area of the fan.

In Fig. 1 the arrow indicates the direction in which the fan is to rotate; 16 indicates the leading edges of the blades, 18 the peripheral edges, and 17 the trailing edges.

Different views are shown in Figs. 1–4, inclusive, of a fan of this wide bladed type in which the surface of the blade is so curved that it has a "pitch" which increases in the direction from the outer periphery to the hub of the fan, and in which the trailing edge is turned up.

Fig. 5 shows a modified form in which the surface of the blade is a plane surface to a point near the trailing edge, but which is turned up near the trailing edge. As explained in the patent, the "pitch" of a blade with such a plane surface increased from the leading edge to the median line of the blade, and then decreases up to the point where the blade is turned up, when it again increases.

With reference to the form shown in Fig. 5, the patentee says: "The operation of this fan compares favorably with the operation of the preferred form of blade as illustrated in Fig. 2 and its formation is somewhat less expensive than the preferred form of blade." Page 2, lines 46–50.

A third form of surface configuration is shown in Fig. 6, in which the curvature of the blade is such that there is an increasing pitch over the whole of its surface from leading edge to trailing edge; the surface of the leading part of the blade being a plane, and the whole trailing end being curved in order to "provide a surface of increasing pitch for this part of the blade" as well as for the leading end of the blade.

The patent speaking of reduction of noise says: "The fan is generally indicated by the numeral 10 and comprises three blades 11, 12 and 13 secured to a hub 14 by means of screws 15. The amount of noise produced by a fan increases with the number of blades providing other features of the fan remain the same. If one blade were used, and its area made sufficiently large to move a relatively large quantity of air then its axial length would of necessity be too long. This would also be true of a fan with two blades. I prefer to use three blades for fans run at speeds between 1100 and 1600 R.P.M. but a greater number of blades may be desirable when it is possible to run the fan at a lower speed. The decrease in speed offsets the increase in noise which would be occasioned by the greater number of blades." Page 1, lines 59–75.

The patent further says: "As best indicated in Fig. 1 the trailing end of one blade overlaps the leading end of the following blade. In other words looking at the face of the fan, the leading end of one blade extends behind the trailing end of the blade preceding it in the direction of the rotation of the fan. Thus the trailing end of one blade shields the leading end

of the following blade which assists in reducing the noise of the entrance of air into the fan. The overlapping blades also makes it certain that the maximum disc area of the fan is being utilized. By thus utilizing the full disc area of the fan it is possible to considerably reduce the diameter of the fan and at the same time move a large quantity of air. The reduction in the diameter of the fan is extremely important in the noise reduction of the fan because it reduces the peripheral velocity of the tip of the blades. The high peripheral velocity of the tip is the source of much of the noise of many fans." Page 2, lines 130–150.

The patent also specifies: "The fan blades are not extended to 90° ahead of the radius 0–0' because it would make the fan too long in its axial length. It has been found that it is quite satisfactory to extend the blade at the periphery to about 75° ahead of the radius 0–0' where the pitch is sufficiently low so that the air may be picked up without noise." Page 2, lines 88–95.

■ Claim 1 (which is not in suit) claims specifically this feature of a leading end 75° long and a trailing end 60° long. No such limitation as to width is found in any of the claims in suit, and its absence indicates, under the claim differentiation doctrine, that they were not intended to be so limited. Smith v. Snow, 294 U.S. 1, 55 S. Ct. 279, 79 L.Ed. 721.

The number of blades determine the blade width when it is coupled with the requirement that the blades overlap.

The only limitation as to number that I find expressed in the patent is that the number of blades cannot practically be less than three.

The requirement of the claim in suit that the fan shall have a total blade area "substantially equal to the disc area" is found in the Breezo fan (Exhibit Y) just as well as in the three-bladed fan shown in the patent in suit.

■ A claim reciting "numerous" fan blades is not limited to any especial number. Sirocco Engineering Co. v. B. F. Sturtevant Co. (C.C.A.) 220 F. 137.

Of course it is generally true, and this was well known and not a discovery by Upson, that the "amount of noise produced by a fan increases with the number of blades providing other features remain the same." Nor was it a discovery of Up-

son that when the fan could be run at a lower speed the decrease in speed would counteract the increase in noise occasioned by the greater number of blades.

The blades are planes or modified planes, and if it be assumed that the blade is planar throughout its entire area, then a series of arcs may be drawn about the axis of rotation as a center, with the result as shown in Fig. 3 of the patent in suit. Each of these arcs is said to represent the path of travel of a particle of air across the blade of a fan as it rotates, and the pitches of a fan blade are always to be measured on these arcs.

In a planar blade there is a certain central radius at which the pitch is maximum. Ahead of this central radius and approaching the leading edge, the pitch decreases until, if the blade extends forward 90° from the central radius, the pitch reaches 0. Likewise, the pitch decreases back of the central radius toward the trailing edge until, at 90° back of the central radius, it reaches 0. Whatever the pitch is at the central radius where the surface of the blade is a plane, and whatever is the width of the blade, the pitch will gradually increase from the leading edge to a maximum at the central radius, and back of the central radius it will decrease toward the trailing edge.

By his adoption of this well-known fact, the patentee was permitted to gradually put the air in motion and to accelerate it as far back as the central radius, and to compensate for the decrease in pitch back of the central radius, the patentee proposed two well-known remedies. The first, the less desirable but cheaper remedy, was to turn up the trailing edge, a modification of Fig. 5 in which the air is accelerated to the central radius, and then as far back as the blade is concerned, it is decelerated by the decreasing pitch until it reaches the turned-up portion immediately adjacent the trailing edge, which gives the air a final impulse with considerable acceleration, but not a smooth motion. The second remedy is shown in Fig. 6, and consists of a gradual curving up of the trailing end throughout its extent from the central radius back until at the trailing edge the blade has the greatest curvature. This blade may have gradually increasing pitch throughout its extent since, inherently, the planar leading end has this characteristic.

The blades of Fig. 5 and Fig. 6, in which we are interested, have planar lead-

ing ends and differ only in their trailing ends. Only Fig. 6 has constantly increasing pitch throughout.

The edge contours are the same in both types of blades. They consist of the leading edge, the peripheral edge, and the trailing edge. The patentee limits his description of the trailing edge to substantially a straight line merely rounded off towards the periphery, but he does have a trailing edge as distinguished from his peripheral edge.

The patentee described the leading edge 16 as concave and extending forward progressively from the hub to the outer periphery of the blade, and describes its object as twofold, so that the initial axial displacement of the air is constant, and so that more air may be picked up. As I read the specification, the concave curve must be such that the initial axial displacement of air is constant.

The peripheral edge need not be described as it appears only in claim 14, which is not now relied upon by plaintiff. It is sufficient to say that there is a distinct demarcation between the peripheral edge 18 and the leading edge 16.

The patent in suit summarizes the features of the invention as follows: "From the foregoing it may be seen that a blade for fans is provided which reduces the noise of their operation by· causing particles of air to travel along a plane surface which is a surface of gradually increasing pitch for the leading part of the blade, by utilizing the full disc area of the fan thus reducing the diameter of the fan for a given output to decrease the peripheral speed of the blades, and by shaping the leading edges of the blades to reduce the noise of the pick-up of the air." Page 3, lines 9–19.

The features so explained in the patent are quite different from plaintiff's present position that the patent in suit covers the use for desk fans of six or less wide blades.

I can find no basis in the Upson patent in suit for limiting the number of blades to six. Nowhere in the patent is the number six mentioned as the number to which the blades are limited. The Upson patent in suit does not definitely limit the number of blades. In the drawings three blades are shown, and in all the commercial fans involved of both plaintiff and defendant, four blades are used. As three blades are shown and four are used, why limit the number to six? They are not so limited

by the claims in suit. I find no support in the drawings for any theory that the number of blades must be limited to six so that the width is at least as great as the radial length. The specific limitation of claim 1 requiring the leading end to be 75° wide and the trailing end about 60° wide does not in this case support the theory that the number of blades is limited to six, as that claim is directed to a three-bladed fan. Claim 1 is not in suit, and no such limitation as to width is found in any of the claims in suit. The quotation from the patent, page 2, line 136, does not support the theory of the limitation of the blades to six in number. As I understand that quotation, it means that by using the full disc area with a small fan as much air can be moved as with a large fan not employing the full disc area. That certainly does not limit the number of blades to six, because, if delivery is increased by full disc area, it would be just as true with eight blades as six, if they be made wide enough to overlap.

Plaintiff's further contention is that the Upson patent in suit teaches that to have a quiet fan, you must avoid separation. Nowhere in the Upson patent in suit do I find any mention of separation.

Certainly it is not claimed in any of the claims in suit, and I do not see how by that theory the number or width of the blades can be limited, when there is no such limitation in the patent in suit.

Of course, the patentee need not know why his invention obtains a certain result, but he must have described the structure which he claims to have invented, and if wide blades of a limited number constituted a part of the structure which he claimed to have invented, the patent should have so stated and claimed them.

He did not, and he did not limit his invention to three blades or six blades, but said that any number of blades could be used. It does not seem to me that any limitation to the number of blades nor to wide blades can be read into the claims in suit. All that I can find that Upson required as to the width of the blades in the claims in suit is that they should be wide enough to overlap.

The theory of separation is based on what purports to be air flow around an airfoil section of some kind. Plaintiff's Exhibit 27 apparently shows that both smooth flow and separation flow occur on the same body, but does not illustrate air flow in

fans. Plaintiff's Exhibit 28 is a showing of the flow of air around cross-section of a wing of an airplane. View 1 shows that the flow is smooth as long as the angle between the object and the direction of the flow is small. View 2, in which the angle of attack has been increased, that is, the airplane wing has been tilted more relative to the direction of the flow, and this, plaintiff contends, results in the so-called separation which is the vortices on the back or low-pressure side of the wing. This does not prove to my mind that separation may be avoided only by large blades, and nowhere in the patent do I find mention of any way to avoid separation.

In his discussion of his theory of separation plaintiff's witness Peters invoked the term "Angle of Attack" which is not mentioned in the Upson patent in suit, and must be distinguished from pitch.

The following definition of pitch is found in the Upson patent in suit: "The angle between the fan blade and the plane of the fan measured at right angles to radius O–K is cos. x times the angle at the radius 0–0' or 25 cos. x. This angle gives the pitch along the radius O–K." Page 2, lines 68–72.

Generally speaking, and for all purposes in connection with fans, the angle of attack is the angle between the line joining the leading and trailing edges on the blade, and the direction of movement of the air being cut by the blades.

I cannot, however, find, anywhere in the specification of the Upson patent in suit, any instructions as to angle of attack, and therefore it does not seem to me to be important in this case.

Without further discussion it seems clear to me that the theory of separation has not been proved, and, in any event, I am convinced that separation is not avoided by any particular number of blades, but may be eliminated with any number, large or small.

This theory is not disclosed in the specification, shown in the drawings, nor are the necessary elements recited in the claims of the Upson patent in suit, and it cannot be read into the patent or its claims. Fulton Co. v. Powers Regulator Co. (C.C.A.) 263 F. 578, 582; Mitchell v. Tilgham, 19 Wall. (86 U.S.) 287, 395, 22 L.Ed. 125.

It therefore seems quite clear to me that the Upson patent in suit is not exclusively for desk fans, nor is it a patent for wide-bladed fans, nor for any limited number of blades, nor are the blades limited to six in number or their radial dimension not to exceed their width dimension.

The Upson patent in suit, as I read and understand it, is for blades of restrictive surface and edge contours, and this is expressed in every claim in suit.

These contours are essential elements of the claims in suit, and unless it be shown by plaintiff that the accused fans have such of these elements, as may be expressed in each of the claims in suit,'there is no infringement of such claim as to such fan.

The accused devices are described as follows:

The "Silver Swan" fan blade is a portion of a right helicoid, that is, a surface of constant pitch at all points on its surface.

The mounting of the "Silver Swan" fan on the tapering hub brings the trailing tip inward toward the axis of rotation, and extending inwardly further than any part of the leading end. The pitch angle of a helicoidal surface increases as one approaches the hub, since the rise of the surface is the same along its generating line, and therefore, although the inner trailing tip of the "Silver Swan" blade has a steeper angle, its pitch is precisely the same as that of the leading end. The inward curving of the trailing tip of the "Silver Swan" blade produces an optical illusion that the blade has greater pitch on this tip; but this is not the fact. There is no change in curvature, real or apparent, on lines across the blades at a constant distance from the axis. The trailing tip, therefore, is only a small part of the trailing end, and it does not turn up relative to any part of the leading end.

The blade of the "Silver Swan" fan has an edge contour comprising a convex leading edge blending smoothly into the peripheral edge; and a convex trailing edge that extends in a smooth curve from the peripheral edge to the inner tip of the blade. The peripheral edge of the blade is a curve drawn on a constant radius, from the leading edge to back of the middle of the blade.

The "Lindberg" fan blade is a portion of a cylindrical surface. The axis of the cylinder is at an angle to the line of attachment. The pitch is constantly increasing. The leading edge is a convex curve that extends from substantially the hub to the

line of attachment. The peripheral edge, extending from the line of attachment to the trailing edge, has a constant radius. There is no central radius in the same sense as in the patent in suit, since the line of attachment cuts across at an angle to the cylinder axis, and, therefore, is not a straight line.

Let us first consider the "Silver Swan" fan.

This fan is alleged to infringe claims 8, 9, and 17 of the Upson patent in suit, which read as follows:

"8. In a fan, a plurality of blades, each blade having a leading end with a substantially plane surface and a trailing end of increasing curvature toward the trailing edge with the maximum curvature near the trailing edge, the combined area of the blades being at least substantially equal to the disc area of the fan.

"9. In a fan, a plurality of blades each having a curved leading edge, a leading end substantially a plane surface, a trailing end of increasing curvature from adjacent the leading end to the trailing edge of the blade, the combined projected area of the blades at right angles to the axis of rotation of the fan being at least substantially equal to the disc area of the fan."

"17. In a fan, a plurality of blades each having a curved leading edge, a leading end substantially a plane surface, and a turned up trailing edge, the combined area of the blade surfaces being at least substantially equal to the disc area of the fan."

Each of these claims are for a combination, and the defendant may not be held to be an infringer of any of these claims, unless it uses all the elements thereof. Cimiotti Unhairing Company v. American Fur Refining Company, 198 U.S. 399, 410, 25 S.Ct. 697, 49 L.Ed. 1100.

Each of these claims requires as one of the elements of its combination that the leading end of the blade be substantially a plane surface. A plane surface is a flat surface. The leading end ·of the "Silver Swan" blade (Exhibit 34A) is not flat. It measures in all about 3½ inches by 3¾ inches, and rested on flat surface it may be seen to deviate therefrom by as much as 7/16 inch. The variation may conservatively be said to be ⅜ inch. I cannot agree with plaintiff's contention nor the statement of its witness Peters that Exhibit 34A is substantially a plane. The variation

is too great. Furthermore, if the expression "substantially planar leading end" is to be so broadly interpreted, as to cover a right helicoid, which is not planar, there must be found at least identity of function between the two surfaces. The function of the planar leading end is shown in the Upson patent in suit as follows:

"Thus any particle of air travelling along the surface of the blade travels in a plane. Also, the pitch along this arc increases from the leading edge of the fan blade to the radius 0-0'. * * *" Page 2, lines 14–17.

"* * * A blade for fans is provided which reduces the noise of their operation by causing particles of air to travel along a plane surface which is a surface of gradually increasing pitch for the leading part of the blade. * * *" Page 3, lines 9–14.

The "Silver Swan" blade is a right helicoid, and in no place is it a plane, nor does it produce gradually increasing pitch.

The "Silver Swan" fan does not respond to element 3 of claims 8, 9, and 17 of the patent in suit.

A trailing end of increasing curvature toward the trailing edge appears in substantially the same form as an element in claims 8 and 9.

The shape of the trailing edge in claim 17 is recited as merely "turned up," and no particular characteristic is required as to that portion of the trailing end between the central radius and the turned-up portion of the trailing edge.

Plaintiff does not sustain its contention by removing a "Silver Swan" blade from its hub and then urging that it has a planar leading end, and a turned-up trailing end. Defendant does not use the blade detached, and it is only when the blade is secured in defendant's peculiar way, that it is the right helicoidal surface required by defendant.

The entire purpose of the increasing curvature or turn up of the blade of the patent in suit was to compensate for the decreasing pitch inherently present in a planar trailing end, and neither in the patent or record is any other purpose given. If increasing curvature does not produce the increasing pitch, it has no meaning in the patent in suit.

As represented by Exhibit QQQ, in the great majority of the trailing ends of defendant's structure there is not even an

apparent increase in curvature, and only on the small inner tip does the curvature even seem to increase, or the blade turn up. At most, this tip includes but one-fifth of the trailing edge, or the trailing end (Exhibit YY), and it cannot properly be said that the presence of this trailing tip causes the "Silver Swan" fan to have a trailing end of increased curvature, or turned-up trailing edge.

In the Upson patent in suit, curvature and pitch are made synonymous; but even, if, as argued on behalf of plaintiff, they were different, the "Silver Swan" blade does not have increasing curvature in the technical sense of that word. A surface of constant curvature (but not constant pitch) is a cylindrical surface, and is represented by the "Lindberg" blade. The "Silver Swan" fan does not have a constantly increasing curvature on its trailing end, but does have a decreasing curvature on the trailing end, which becomes negative at the edge, and does not have any change of curvature along any path that produces any change in pitch. The "Silver Swan" blade does not respond in terms or in function to the requirements of element 4 of claims 8, 9, and 17 of the Upson patent in suit.

The "Silver Swan" fan has a curved leading edge, but it does not have the leading edge of the Upson patent in suit.

In the curved leading edge, Upson sought two objectives; increased air pickup, and constant initial axial displacement of air. The leading edge of the "Silver Swan" fan is convex, and has nothing to do with the attainment of constant initial axial displacement of air. The "Silver Swan" is a helicoid, and the pitch is constant over its entire surface, and any leading edge, however drawn, will inherently have constant displacement due to the blade surface alone. The planar blade of Upson does not have it, and he sought to attain it on his blade by his curvature.

If claims 8, 9, or 17 can be construed as broad enough to cover a curved blade leading edge, whatever the purpose of the curve, then such claims would be invalid in view of the prior art.

■ The burden of proof of infringement rests on the plaintiff. Brooks et al. v. Jenkins et al., Fed.Cas.No.1953; Béné v. Jeantet, 129 U.S. 683, 9 S.Ct. 428, 32 L.Ed. 803.

■ To sustain this burden the plaintiff must show identity of result, identity of means, and identity of function of the means. Electric Railroad Signal Company v. Hall Railway Signal Company, 114 U.S. 87, 96, 5 S.Ct. 1069, 29 L.Ed. 96.

This plaintiff has failed to do, so as there is no identity of the results sought by Upson and obtained by the "Silver Swan" fan, and no identity of means.

■ The claims are the measure of the invention. Fulton Co. v. Powers Regulator Co. (C.C.A.) 263 F. 578, 580.

■ There must be a response in the accused device to every element of the claims sued upon. Shepard et al. v. Carrigan, 116 U.S. 593, 597, 6 S.Ct. 493, 29 L.Ed. 723; McClain v. Ortmayer, 141 U.S. 419, 425, 12 S.Ct. 76, 35 L.Ed. 800.

The following elements of the claims in suit of the patent in suit are not found in the "Silver Swan" fan, a planar leading end, a trailing end with increasing pitch, or curvature, a turned-up trailing edge, and without them infringement cannot be established. Further, I cannot find in the "Silver Swan" fan, identity in the manner in which the following elements are combined to operate in the Upson patent in suit; a planar leading end producing gradually increasing pitch, a curved or turned-up trailing end producing gradually increasing pitch, a curved leading edge producing constant initial axial displacement of air.

■ Mere verbal response to the claims, even if it be found, is insufficient. Westinghouse v. Boyden Power Brake Company, 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136; Grubman Engineering & Mfg. Co. v. Goldberger (C.C.A.) 47 F.2d 151, 152.

■ That the "Silver Swan" fan is a quiet fan, does not establish infringement, as that is but a result, and a result is not patentable. Erastus Corning et al. v. Peter A. Burden, 15 How. 252, 268, 14 L.Ed. 683. Such quiet does not result from the "Silver Swan" fan having increasing pitch, or planar leading end with a curved leading edge producing constant initial axial displacement of air, or a curved or turned-up trailing end.

■ Plaintiff contends that it has had great commercial success for its wide-bladed fan, but, as I am not passing on the validity of claims 8, 9, and 17, only on the alleged infringement of those claims by the "Silver Swan" fan, it requires no extended consideration. In any event, the

commercial success relates only to claim 17, and such success as the General Electric fan (Exhibit 19) has attained may well be attributed to the surface and edge contours of its blades, which are in accordance with the requirements of claim 17, whereas the blades of the "Silver Swan" fan are not constructed in accordance with the requirements of that claim.

The surface and edge contour requirements of claims 8 and 9 are not found in General Electric fan (Exhibit 19).

██ The defendant's "Silver Swan" fan does not infringe claims 8, 9, or 17 of the Upson patent in suit.

We will now consider the "Lindberg" fan.

The surface characteristics of the blades of this fan differ from those of the "Silver Swan" fan, and it is accused under different claims of the Upson patent in suit, viz., claims 7 and 14, but plaintiff relies only on claim 7; therefore, claim 14 may be eliminated from this discussion.

Claim 7 reads as follows: "7. In a fan, a plurality of blades each having a leading edge and a trailing edge and a surface of gradually increasing pitch from the leading edge to the trailing edge of the blade, the combined area of the blades being at least substantially equal to the disc area of the fan."

The "Lindberg" fan was developed and tested as early as June 1931. Exhibits S. and T.

The application for the "Lindberg" patent was filed January 22, 1932, two days later than Upson's, and the patent, No. 1,953,417, was issued April 3, 1934, a month before the Upson patent in suit. The first wide-blade General Electric fan was presented in 1933; but the "Lindberg" development occurred long prior to that time. It is quite clearly established that Emerson did not appropriate the General Electric design.

The Emerson desk fan of 1905 (Exhibits Q and X) had a cylindrical roll practically the same as the present "Lindberg" blade, and the axis of roll of that 1905 desk fan is not radial, but has a backward rake to it, the same as the "Lindberg" fan. The desk fan of 1905 has substantially the same curved leading edge as "Lindberg," and its cylindrical roll results in a fan blade of increasing curvature or pitch from adjacent the leading end to the trailing edge. In the "Lindberg" fan the blades were merely widened, and the rear edge contour modified somewhat in a manner not here pertinent. This rear edge contour came from the Parker patent (Exhibit H.), and consisted primarily in the removal of the inner fin on the trailing edge thereof. In the "Lindberg" fan there is a slight additional angle to the blades, as disclosed in the "Lindberg" patent, but this has no significance in the present controversy.

Claim 7 may be divided into 5 elements, as follows: (1) A plurality of blades each having (2) a leading edge and (3) a trailing edge and (4) a surface of gradually increasing pitch from the leading edge to the trailing edge of the blade; (5) the combined area of the blades being at least substantially equal to the disc area of the fan.

All fans have leading edges, and trailing edges, and therefore the entire invention alleged by claim 7 resides in the purported combination of gradually increasing pitch and overlap.

A combination of a plurality of blades with leading edge, trailing edge, and generally increasing pitch, is old, as shown by the prior art. Patent No. 632,740 to Parker for ventilating-fan, September 12, 1899; Emerson ventilating fan of 1916; Emerson desk fan of 1926; patent No. 1,-638,129 to Parker for fan blade, granted August 9, 1927; patent No. 1,473,066 to Wells, for fan for automobile radiator; or the like, granted November 6, 1923; patent No. 1,370,284 to Carlson for fan, granted March 1, 1921; Breezo exhaust fan of 1924; patent No. 525,928 to Thompson for ventilating-fan, granted September 11, 1894; patent No. 408,397 to Young for exhaust fan, granted August 6, 1889.

Each of the blade structures of the cited patents and structures shows a leading edge and a trailing edge and a surface of gradually increasing pitch. The actual fans of the patent, No. 632,740, to Parker, had the blades frequently set at such angles that the leading edges were not in the plane of the disc. Exhibit V.

The blade of the Breezo exhaust fan does have a gradually increasing pitch, and that is not disproved by comparing it with the "Lindberg" blade. Comparison must be made with the Upson patent in which there is no limitation at what the pitch shall be, either at the entering edge or the trailing edge of the blade. Neither does the Upson patent in suit say anything about what are the limits of the term "gradually increasing," nor what is a steep increase

in pitch, nor when a gradual increase becomes steep increase.

If there is any difference between pitch and curvature in the Upson patent in suit, both are well known in the art. Increasing curvature as well as increasing pitch are shown in Patent to Young No. 408,397.

All of the elements of claim 7, except the last, have been shown to be old in the art, and that requirement is that the blade area shall equal the full disc area.

All of the elements of claim 7 may be obtained by making obvious and simple changes in certain of the prior art structures. Chart No. 15, Exhibit CCCC. First the Parker patent 1,638,129, which has a planar leading end providing a surface of gradually increasing pitch, and a trailing end so curved as to provide gradually increasing pitch. The only element of claim 7 omitted is the overlap.

The Emerson Company has made fans with six and eight blades.

The Parker patent could be made into a fan with nine blades following the teachings of Breezo, the Desgoffe German patent No. 47,116, and others. It could be made with three wide blades as the Dennis patent 1,725,344; with four wide blades as the De Man patent No. 119,584; or with five as the Carlson patent No. 1,370,284. Overlap was old in the art, and if either of the steps indicated is taken the combined area of the blades will be at least substantially equal to the disc area of the fan, a change so obvious would not be invention. Second, the blades of the Thompson fan patent, No. 525,928, could be increased in number or widened and thereby fulfill the requirements of all of the elements of claim 7. That patent indicates that the particular surface contour is a matter of choice, and has no bearing on the question of overlap, and I can find no co-operation peculiar to the combination of a surface of gradually increasing pitch and overlap. Third, there could be added a couple more blades to the Emerson ventilating fan of 1916, showing six blades, as was done many years before. Exhibit E. Or the several blades could be increased in width until they overlap. If either change be made there would be found every element of claim 7. From the disclosures of the prior art any skilled mechanic could make a fan as disclosed in claim 7, and this would not require any invention.

It seems to me that not only would no invention be required to alter the prior art as shown to produce the elements of claim 7, but the two following references anticipate that claim.

The Breezo fan, as shown on Exhibit DDDD, has a plurality of blades, each with a leading edge, with a trailing edge, with a surface of gradually increasing pitch from the leading edge to the trailing edge, and with the combined area of the blades at least substantially equal to the disc area of the fan. This fills the requirements of claim 7. The Breezo blade is of approximately a conical surface. The Breezo fan does have a constantly increasing pitch, exhibit FFFF. The Breezo fan is an exhaust fan, but that does not detract from its value as a reference, as the Upson patent in suit applies to exhaust fans.

The Breezo fan is not a duct fan that operates against a pressure.

Claim 7 of the Upson patent in suit is anticipated by the Breezo fan.

The Carlson fan, patent No. 1,370,284, has a plurality of blades each with a leading edge, with a trailing edge, with a surface of gradually increasing pitch from the leading edge to trailing edge, and with the combined area of the blades at least substantially equal to the disc area of the fan.

The Carlson patent says:

"The blades are disposed at an angle to the axis of the fan and are of such width that the portions adjacent the hub overlap each other, as is clearly shown in Fig. 1.

"The blades are of unusual width being substantially equal in length and breadth and filling substantially $2/3$ of the circumference of the fan at their outer edges." Page 1, lines 39–46.

As to the uses to which the Carlson fan could be put, the patent says: "This invention relates to a fan capable of general use but particularly designed for a turbine blower." Page 1, lines 8–10.

Claim 7 of the Upson patent in suit is anticipated by the Carlson patent, 1,370,-284.

The alleged commercial success of the plaintiff need not be further considered with reference to the "Lindberg" fan, as such success, if any, must come from claim 7 of the patent in suit, which is the only claim it is charged to infringe, and as I have hereinbefore shown, the only success which can be shown is as to claim 17. Harvey Hubbell, Inc. v. General Electric Co. (C.C.A.) 267 F. 564, 568.

Claim 7 of the Upson patent in suit reads on the "Lindberg" fan and is invalid in view of the prior art.

Plaintiff's contention that the references involving propellers are not in an analogous art with fans is not sustained.

They are classified together in the Patent Office. Exhibit DDDD, page 44.

Aside from any question of estoppel, this was recognized as a fact by Upson, who canceled a claim that was rejected solely on three references, Buhren 1,813,-113; Carpenter 1,438,094; and Maxwell 977,815, each of which was a propeller patent. Fans and propellers were held to be in the same art in Consolidated Patents Co. et al. v. Berry (C.C.) 41 F. 436.

That propellers do make good fans was shown on the trial of the instant suit, by the operation of the De Man fan.

It would not require invention to adapt a propeller to air propulsion.

It is no new invention to use an old machine for a new purpose. Six-Way Corporation v. McCurdy & Co., Inc. (C.C. A.) 85 F.2d 5.

The "Silver Swan" fan does not infringe claims 8, 9, or 17 of the Upson patent in suit; therefore, the question of their validity need not be considered.

Claim 7 of the Upson patent in suit, if read upon the "Lindberg" fan is invalid.

The Gosling Design Patent No. 89076.

The specification of the Gosling patent in suit contains no description of the design, but the claim is as follows: "I claim the ornamental design for an electric fan as shown."

The fan, as shown, has a base from which rises a backwardly curved pedestal, without an oscillator, which pedestal rises to the axis of the motor, and has the motor attached to it. The fan has three wide blades of the Upson type mounted on the so-called bullet shaped hub, with a more or less conventional type of guard.

As to the "Silver Swan" fan, charged in this action to infringe the Gosling patent in suit, Sindermann, plaintiff's witness, stated that there were only two similarities between the "Silver Swan" fan and the Gosling fan, and they were the so-called bullet nose, and the wide blades, and that they exhausted all the identity between them.

In speaking of the wide blades, of course he was speaking generally of the type of blades and not of the four blades of Upson.

There are detailed differences between the designs of Gosling fan and the "Silver Swan" fan.

There being no detailed written description in the Gosling patent in suit, the patent is limited, substantially to the form disclosed in the drawing. Ashley v. Weeks-Numan Co. (C.C.A.) 220 F. 899; Edison Electric Appliance Co. v. Fitzgerald Mfg. Co. (D.C.) 32 F.2d 702, 705, 706.

This of course does not mean that there must be servile imitation of unessential details, but it does mean that where there is no written description in the specification, the owner of the patent cannot base its claim of infringement on blades and hub alone, when its own witnesses said that these were the only similarities, and in fact there are differences in the other features some of which have definite utilitarian value.

The opinion evidence that confusion would occur, and that it would not occur, was given by employees of plaintiff and defendant, respectively, and therefore I may substitute my opinion for theirs. Edison Electric Appliance Co. v. Fitzgerald Mfg. Co., supra.

The attempt of plaintiff to show that there was some confusion in Arkansas in the early part of 1934, by some dealer, alleged to have said, "Why I understand you are going to call it the 'Silver Swan' this year," is not convincing, as it is a statement of something to be done in the future, and certainly does not show that the dealer had ever seen either fan, and certainly does not show that he had seen the "Silver Swan" fan, or had been deceived.

It is not a question of placing the "Silver Swan" and Gosling fan side by side and picking out the differences, but the true test is whether the ordinary purchaser would purchase the "Silver Swan" fan believing it to be the Gosling fan. Ashley v. Weeks-Numan Co. (C.C.A.) 220 F. 899, 902.

The impression made on my eye viewing the respective fans in their entirety, is that they are so different in appearance, that the ordinary purchaser would not purchase the "Silver Swan" fan believing it to be the Gosling fan. I know I would not, and infringement was not proved. American Fabrics Co. v. Rich-

mond Lace Works et al. (C.C.A.) 24 F.2d 365, 367.

This determination is not changed by showing similarities as to nose and wide blades, as it is the impression on the eye of the whole design, not of parts of the design, that is controlling. Whiting Mfg. Co. v. Alvin Silver Co., Inc. (C.C.A.) 283 F. 75, 80.

The "Silver Swan" fan does not infringe the Gosling patent in suit.

A decree may be entered in favor of the defendant against the plaintiff dismissing the bill of complaint on the merits with costs.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by rule 70½ of the Equity Rules (28 U.S.C.A. following section 723), and rule 11 of the Equity Rules of this Court.