## JAMES R. KEARNEY CORPORATION v. LINE MATERIAL CO.
### No. 10961.

Circuit Court of Appeals, Eighth Circuit. March 12, 1938.

Rehearing Denied April 4, 1938.

Edwin E. Huffman, of St. Louis, Mo., for appellant.

Carlton Hill, of Chicago, Ill. (Charles W. Hills, Jr., of Chicago, Ill., Chester W. Brown, of Milwaukee, Wis., and Ralph Kalish, of St. Louis, Mo., on the brief), for appellee.

Before STONE, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This is an appeal from an interlocutory decree holding that two patents belonging to the plaintiff were valid and infringed by defendant. The patents relate to fuse link structures for insertion in electrical circuits to protect electrical apparatus from injury from excessive current which might otherwise exist due to "over loading" or accidental "short circuiting." One of them, No. 1,797,850, was applied for May 19, 1930 and issued March 24, 1931 to L. P. Boll; and the other, No. 1,952,-635, was applied for May 14, 1931, and issued March 27, 1934, to A. G. Steinmayer. A stipulation of the parties established the plaintiff's ownership of the letters patent and the manufacture and sale by defendant of the accused device fully described and exemplified and specified the patent claims relied on as infringed. Our question is whether infringement was proved.

It appears that the use of fuse links to provide an automatic break in electric currents by incorporating in the line a length of fusible material which melts at

predetermined current values is as old as the distribution of electricity for light and power. It is also old art to install fuse links in housing in the form of tubes or cartridges open at one end and closed at the other and to use springs to produce rapid separation of the parts of the fusible element when it is melted by an overload current. Gases which conduct current form when the melting of the fusible element occurs, and the purpose of the quick separation is to prevent the maintenance of an electric arc through such gases conducting current between the separated ends of the fuse. Means to expel the gases and parts of the fuse link from the fuse link cartridge are also old.

Both of the plaintiff's patents relate to the particular type of fuse link structures in which a spring is used for such rapid separation of the fuse parts, and although both are adapted to be installed in tubes or cartridges neither sets forth anything new with reference to the fuse elements or the housing or the uses of the fuse links. In both of plaintiff's patents the springs employed have to be stretched into tension by the workmen in the field at the time the links are installed in the tubes or fuse cartridges to which they are adapted. Such fuse cartridges are of insulating material closed at the top and open at the bottom and have conducting elements near the top and bottom connected to the electrical line. When installed the upper end of the fuse link is made fast at the top of the cartridge in electrical contact with the circuit and the lead wire, which constitutes the lower part of the fuse link, is drawn out of and around the open lower end of the cartridge in a hair pin turn up to the contact point on the outside of the cartridge to which the end of the lead wire is attached completing the circuit. When the overload causes the fuse element to melt in two, its parts are drawn quickly away from each other, and the lower part is expelled from the cartridge.

The prior art illustrations of the use of fuse links, housing therefor in the form of tubes or cartridges closed at one end and open at the other; springs to effect rapid separation of the parts of the fused element and means to effect expulsion of fuse link parts from the cartridge are found in Sawyer, No. 311,681, 1885; Patterson, No. 426,057, 1890; Troy, No. 712,-107, 1902; British Turner, No. 26,454, 1906; Sweitzer, No. 1,873,339, app. 1927, 1932; McGee, No. 1,635,049, 1927; Lemmon, No. 1,937,409.

In Boll's No. 1,797,850 in suit, the application and patent disclose that it was the object of the invention to provide a combination of a weight and a spring which would insure a quick opening of the circuit. The weight was positioned above the spring and below the fuse element and the patentee stated that in the construction he illustrated the break or gap produced between the fuse parts when the fuse melts "would in the absence of the slug or weight 59, not be appreciably greater than the distance which the spring 61 has been stretched at the time of installing the link. It will be seen, however, that after the spring has pulled apart the joint 53, then the dead weight of the slug '59 and the kinetic energy imparted thereto by the spring 61 result in the initial gap being widened, the parts of the link below point 53 dropping entirely from the cartridge tube." In that manner the slug was to help expel from the cartridge the lower parts of the fuse link which would not otherwise be expelled.

The claims of this patent relied on as infringed are:

"3. In a fuse cartridge means for quickly providing a long break comprising a weight, a spring and a length of wire having a fusible point, said weight and said spring being adapted to be expelled from said fuse cartridge when said joint is blown."

"8. In a fuse switch, means for providing a quick and long break under all conditions of overload, comprising a fuse cartridge closed at one end and open at the other, said cartridge containing a tensioned and weighted fuse link."

"10. A switch cartridge comprising a tube having a lower opening and closed top, a fuse link therein connected at the top and outside of said lower opening and having a hairpin turn at said lower opening, a meltable portion in said link near said top and a strained spring and a weight associated with said link between the meltable portion and said lower opening."

"11. A switch cartridge comprising a tube having a lower opening and closed top, a fuse link therein connected at the top and having a hairpin turn at said lower opening, means for fastening said link outside of said opening and a meltable portion in said link near said top and a

strained spring and a weight associated with said link between the meltable portion and said lower fastening means."

"12. A switch cartridge comprising a tube having a lower opening and closed top, a fuse link therein connected at the top, means for fastening said link outside of said opening and a meltable portion in said link near said top and a strained spring and a weight associated with said link between the meltable portion and said lower fastening means."

"13. In a fuse a fuse link, means for uprightly placing said link, an upper meltable portion in said link and a strained spring and weight connected therewith below the meltable portion."

In Steinmayer, No. 1,952,635 in suit the application and patent disclose that the object of the invention was to provide a spring expulsion type of fuse link in which the parts of the fuse link would not be completely expelled from the fuse cartridge after rupture of the fuse. The patentee stated in his application that the spring if so expelled "would dangle loosely from the lower portion of the structure. In view of its relative flexibility, it might readily be blown into other live portions of adjacent structures, or against a grounded section, or it might inadvertently contact with a lineman undertaking to renew the fuse. However, by means of the construction illustrated, the complete expulsion of the spring and adjacent parts is prevented." The patent therefore provided a "rod or rigid member 13" as a part of the fuse link which would prevent the fuse parts from entirely dropping out of the tube after rupture of the fuse element, because when the leader wire fastened as described was extended as far as it would go the rod could not come out but would be left standing up in the tube. The claims of this patent each embody as an element this means of achieving the object of restraining the conducting portions of the fuse link "from passing completely from the fuse tube and dangling therefrom." This feature or element is referred to in the claims as a "relatively rigid section" a "rigid elongated section," and a "relatively rigid portion."

The claims of this patent relied upon as infringed are:

"1. A fuse link comprising a fusible section, a relatively rigid section, a flexible conducting section, and a helical spring coaxial with said relatively rigid section, said spring and said relatively rigid section being coextensive for at least a portion of their respective lengths.

"2. A fuse link comprising a fusible section, a relatively rigid section, a flexible conducting section, and a helical spring guided by said relatively rigid section and telescopically associated with said relatively rigid section.

"3. A fuse comprising a non-extensible tube having an open lower end and having contacts adjacent each end; a fuse link carried within said tube and joining said contacts, said link comprising a fusible section, a relatively rigid elongated section, and a flexible section, and a spring secured to said relatively rigid section, said relatively rigid section being telescopically related to said spring.

"4. An expulsion fuse comprising a tube having an open lower end and having an upper contact and a lower contact; a fuse link in said tube and joining said contacts, said link having a fusible portion and a relatively rigid portion; and a spring for separating the severed portions of said fusible portion when said fuse blows, said relatively rigid portion of said link projecting downwardly from the opening end of said tube when said fusible portion is ruptured."

The defendant's accused device is an expulsion type fuse link adapted for use in a fuse cartridge and employs a spring to quickly separate the parts after the overload has melted the fuse element. It comprises means conducting current consisting of a piece of metal attached (when installed) to a metal contact block at the upper end of the fuse cartridge, a fusible element attached below the metal piece, and a flexible wire conductor attached to the fusible element and extending in a loop out of and around the wall of the fuse cartridge at the open lower end thereof connecting with and completing the circuit at the other contact block on the outside of the fuse cartridge. It also includes a small fiber tube in which the fusible element of the link is located and a spiral spring is compressed between the lower end of the fiber tube and a disc soldered to the conductor wire. A small copper sleeve positioned inside the compressed spring holds the spring straight. When the fuse is ruptured by overload current, the compressed spring quickly expands to force the conductor downward

and thereby separates the fused ends of the fusible section and breaks the circuit. The conductor, the spring, the little copper sleeve, and the unburned portion if any of the fuse element remaining attached to the conductor are expelled from the lower end of the tube.

Defendant's device embodies in the fuse link structure two necessary abutments for its compressed spring and is manufactured as a unit and installed in the field without any stretching of the spring at the time of installation.

It will be observed from the description of the defendant's device that it does not include any element like the slug 59 in the Boll patent intended to function as a weight in combination with the spring to expel the link parts from the cartridge, and also that the accused device does not include any element like the "rod or rigid member 13" of the Steinmayer patent intended to perform the function of preventing the complete expulsion of the spring and adjacent parts from the tube.

▮ Plaintiff contends that the copper sleeve of the defendant's structure which is positioned inside the compressed spring and holds the spring straight while it is compressed is an equivalent of the weight included as an essential element in each of the claims relied on in the Boll patent. We find no substantial support for this contention in the evidence. It is true that the sleeve has weight (something like twenty-six thousandths of an ounce), but it is not dead weight like the "slug" of the Boll patent. The copper sleeve element performs its useful function as a sleeve and facilitates the manufacture of the device as a unit not requiring any tensioning of the spring on installation, thereby effecting substantial mechanical improvement. As the defendant's device does not embody the weight (slug 59) of the Boll patent or any equivalent thereof, the device cannot be said to perform the same function in substantially the same way to obtain the same result as an embodiment of the patent would do, and so it does not infringe the patent.

As to the Steinmayer patent, it is apparent that the defendant's accused device does not perform the function of retaining the lower parts of the fuse link in the fuse cartridge after the rupture of the fuse element. On the contrary, such lower parts of the fuse link are expelled in the operation of defendant's device. The reason is that the accused device embodies no element like "rod or rigid member 13" of that patent. The wording descriptive of "the rod or rigid member 13" in claims 1 and 2 is "relatively rigid section," in claim 3 "relatively rigid elongated section" and in claim four "relatively rigid portion." The plaintiff argued that the "rod or rigid member 13" of the Steinmayer patent could be made so short and the conductor below it so long that the declared object of the invention could be avoided and the parts could be expelled, from the fuse cartridge on the rupturing of the fuse element. So in the accused device the little copper sleeve within the compressed spring could be made so long and the loop of the leader so short that the parts of the fuse link could be prevented from being expelled from the cartridge and the device would fail to work as intended. So it was argued that equivalent elements could be made to appear in the claims of the Steinmayer patent and the accused device and infringement found. We think not.

▮ The plaintiff fails to show infringement when he is obliged to read his patent claims so broadly that they entirely cease to represent the invention. Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136; Grubman Engineering & Mfg. Co. v. Goldberger, 2 Cir., 47 F.2d 151.

▮ It is argued in support of claimed infringement that the Boll and Steinmayer inventions and patents should be given broad scope and a broad range of equivalents; that the patents comprise novel combinations of elements combined in a unitary structure whereby the desired result is obtained in a more facile, economical and efficient way; that they solved a problem long existing; their simplicity evidences their great merit; that defendant's subsequent designing and use of its device with knowledge of plaintiff's patents constitutes admission that plaintiff's structures had solved long existing problems; that the slug 59 in the Boll patent receives impact from gases on rupture of the fuse element aiding expulsion of the fuse link parts and so does the copper sleeve of defendant's device; that the relatively rigid section of the Steinmayer patent is telescopically associated with the spring, and the sleeve of defendant's device is telescopically associated with the spring of that device; that a helical

spring in Steinmayer is "guided by the relatively rigid section"; and that the helical spring of defendant's device is guided by the sleeve. Upon consideration of all the contentions made for plaintiff, we are satisfied defendant's device does not embody the elements of either of the plaintiff's patents and that no infringement was proven.

Reversed and dismissed.