The BIRMINGHAM SMALL ARMS
COMPANY, INCORPORATED,
Plaintiff,

v.

BROOKLYN CYCLE, INC., Defendant.

Anthony P. DE SALVATORE,
Plaintiff,

v.

BIRMINGHAM SMALL ARMS COM-
PANY, INC., and Triumph Norton,
Ltd., Defendants.

Nos. 73 Civ. 730 and 74 Civ. 752.

United States District Court,
E. D. New York.

Feb. 4, 1976.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Birmingham Small Arms and Triumph Norton.

Benjamin J. Golub, New York City, for Brooklyn Cycle and Anthony P. De Salvatore.

## OPINION AND ORDER

PLATT, District Judge.

Triumph Norton Incorporated (formerly known as The Birmingham Small Arms Company, Incorporated) ("Triumph") moves for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary judgment in its favor upon all claims and counterclaims asserted in the above entitled actions on the grounds that there is no issue as to any material fact and that Triumph is entitled to summary judgment in its favor as a matter of law.

### Facts

The attorneys for the parties filed a statement and counter-statement of ma-

terial facts pursuant to General Rule 9(g) of this Court and the following material facts have been agreed upon by reason thereof:

1. Triumph is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in the State of California. Triumph is the successor corporation to, and was formerly known as, The Birmingham Small Arms Company, Incorporated. Triumph is engaged in the sale of motorcycles, parts and accessories.

2. Brooklyn Cycle, Inc. ("Brooklyn Cycle") is a New York corporation with its principal place of business located at 8807 Fourth Avenue, Brooklyn, New York. Brooklyn Cycle was and is engaged in the business of the sale, service and repair of motorcycles in the City and State of New York.

3. Anthony P. De Salvatore is, and at all times during the existence of Brooklyn Cycle was, President of Brooklyn Cycle and is owner of 50% of the outstanding shares of Brooklyn Cycle. Mr. De Salvatore was also employed by the New York City Police Department, but his employment with the Police Department terminated in 1971. John L. Pino is, and at all times during the existence of Brooklyn Cycle was, Secretary-Treasurer of Brooklyn Cycle and is owner of 50% of the outstanding shares of Brooklyn Cycle.

4. G.A.C. Private Brands, Inc. ("G.A.C.") is a corporation duly organized and existing under the laws of the State of Pennsylvania with its principal place of business in the State of Maryland. G.A.C. is engaged in consumer and business financing. G.A.C. has assigned all rights, title, and interest to any and all claims against Brooklyn Cycle and its officers to Triumph and Triumph has repaid to G.A.C. debts owed to G.A.C. by Brooklyn Cycle.

5. On January 16, 1971, Brooklyn Cycle and Triumph entered into an initial written agreement ("dealer sales agreement"). This written dealer sales agreement between Brooklyn Cycle and Triumph was renewed once on January 20, 1972. Exhibits A and B, attached hereto, are true and correct copies of the dealer sales agreements entered into between Brooklyn Cycle and Triumph. Under their terms, each dealer sales agreement commenced October 1 of the year in which it was signed and expired on the next succeeding September 30 unless cancelled or terminated prior to that date by either party. By letter dated January 9, 1973, Triumph notified Brooklyn Cycle that the dealer sales agreement was terminated.

6. Triumph and Brooklyn Cycle sought and obtained credit to enable Brooklyn Cycle to finance purchases of motorcycles from Triumph. Triumph assisted Brooklyn Cycle in obtaining such credit from G.A.C. by, among other things, recommending Brooklyn Cycle to G.A.C. and guaranteeing to repay G.A.C. if Brooklyn Cycle defaulted on any loans made to it by G.A.C.

7. On November 5, 1971, Brooklyn Cycle and G.A.C. entered into a financing agreement ("Security Agreement") pursuant to which G.A.C. provided floor plan financing to Brooklyn Cycle. Anthony P. De Salvatore signed this Security Agreement on behalf of Brooklyn Cycle. Under the terms of the Security Agreement, G.A.C. advanced money to Brooklyn Cycle to enable Brooklyn Cycle to purchase motorcycles from Triumph. In turn, Brooklyn Cycle agreed to hold motorcycles acquired from Triumph and the proceeds received from the sale of such motorcycles in trust for G.A.C. Exhibit C, attached hereto, is a true and correct copy of the Security Agreement. G.A.C. perfected its security interest in this inventory, equipment, and proceeds by filing a financing statement, signed by Anthony P. De Salvatore, on November 11, 1971, in accordance with the Uniform Com-

mercial Code. Exhibit D, attached hereto, is a true and correct copy of the financing statement.

8. In order to carry out the purposes and intent of the Security Agreement, Brooklyn Cycle executed and delivered to G.A.C. an Authorization for Signature Agreement on November 5, 1971. Anthony P. De Salvatore signed this Authorization for Signature Agreement on behalf of Brooklyn Cycle. This Authorization for Signature Agreement authorized G.A.C. to execute, in Brooklyn Cycle's name, trust receipts, promissory notes, and other documents necessary to secure the repayment of the sums of money advanced to Brooklyn Cycle by G.A.C. Exhibit E, attached hereto, is a true and correct copy of the Authorization for Signature Agreement.

9. Brooklyn Cycle began operating as a Triumph dealer sales outlet at a location at 163–15 Cross Bay Boulevard, Queens, New York, in 1971.

10. Anthony P. De Salvatore had responsibility for conducting the business affairs of Brooklyn Cycle and had primary responsibility for conducting the operations of Brooklyn Cycle's Triumph dealer sales outlet located at 163–15 Cross Bay Boulevard. As part of that responsibility he disbursed, or authorized and approved the disbursement of, funds received by Brooklyn Cycle from the sale of Triumph motorcycles. Mr. De Salvatore disbursed, or authorized and approved the disbursement of, such funds to creditors of Brooklyn Cycle, including but not limited to G.A.C. and to himself.

11. During the period February, 1972, through August, 1972, Triumph sold and delivered to Brooklyn Cycle, on or about the dates indicated in Column III, below, the Triumph motorcycles identified in Columns I and II, below. Brooklyn Cycle accepted delivery of these identified motorcycles. These identified motorcycles were not in Brooklyn Cycle's possession on January 6, 1973 when G.A.C., pursuant to the Security Agreement, repossessed Triumph motorcycles in Brooklyn Cycle's possession, since Brooklyn Cycle had sold these identified motorcycles. At the time of delivery of the identified motorcycles, G.A.C. advanced to Brooklyn Cycle the sums of money identified in Column IV, below, to finance Brooklyn Cycle's purchase of the identified motorcycles. The balance of each such advance which Brooklyn Cycle has not repaid to G.A.C., although it is due and owing, is identified in Column V, below.

| I. Model No. | II. Serial No. | III. Sale and Delivery Date | IV. Amount of Advance | V. Balance |
|---|---|---|---|---|
| T100R | 4573 | 2/11/72 | $1,071.25 | $ 857.00 |
| T120R | 31479 | 2/11/72 | 1,237.75 | 990.20 |
| T150T | 1312 | 4/11/72 | 1,393.00 | 1,114.40 |
| T150V | 2077 | 5/17/72 | 1,449.00 | 1,449.00 |
| T150V | 1964 | 6/ 5/72 | 1,449.00 | 1,449.00 |
| TR6R | 44963 | 6/ 9/72 | 1,164.00 | 1,164.00 |
| T100R000 | 57416 | 6/23/72 | 1,071.25 | 1,071.25 |
| T100R000 | 57748 | 6/23/72 | 1,071.25 | 1,071.25 |
| T100R000 | 57545 | 6/23/72 | 1,071.25 | 1,071.25 |
| T150V | 2709 | 8/ 1/72 | 1,449.00 | 1,449.00 |
| T150V | 3097 | 8/ 1/72 | 1,449.00 | 1,449.00 |
| | | | | $13,135.35 |

12. Each time G.A.C. advanced to Brooklyn Cycle the sum of money identified in Paragraph 11 of this statement to cover the cost of purchasing a Triumph motorcycle, a promissory note containing a promise by Brooklyn Cycle to repay the sum of money identified upon request, plus interest, was executed in accordance with the Security Agreement and the Authorization For Signature Agreement. The copies of the promissory notes attached hereto and identified as Exhibit F are true and correct copies of these promissory notes.

13. On or about November 9, 1972, Brooklyn Cycle drew on its account at the Bankers Trust Company and delivered to G.A.C. a check in the amount of $8,807.20, payable to G.A.C. This check was duly endorsed by G.A.C. and was duly presented to the Bankers Trust Company for payment on or about November 14, 1972, and said bank refused payment thereof.

On the oral argument on September 19, 1975, the attorney for the defendant Brooklyn Cycle conceded that the plaintiff Triumph was entitled to summary judgment in the first of the above-captioned actions in the amount of $13,-135.35, plus interest and costs. This concession eliminates the asserted "issue" that no demand was ever made of Brooklyn Cycle for repayment of the sums of money owed to G.A.C. by Brooklyn Cycle.

A further comparison of the statement and counterstatement under Rule 9(g) submitted by the attorneys for the parties herein reveals that only the following remaining material facts may be in dispute in whole or in part:

"1. * * * upon information and belief, Triumph is also engaged in the sale of automobiles, automobile parts and accessories.

* * * * * *

"3. At all relevant times herein mentioned with respect to this case LEROY BACKITY was the district manager of TRIUMPH for the district wherein BROOKLYN CYCLE maintained its principal place of business (Brooklyn and Queens) and as such was TRIUMPH's only representative who dealt with and came into contact with BROOKLYN CYCLE and who made recommendations with respect to TRIUMPH's policy towards BROOKLYN CYCLE.

* * * * * *

"16. The sum claimed due and owing to TRIUMPH was not paid to G.A.C. because of the fact * * * TRIUMPH illegally, wrongfully and unlawfully terminated BROOKLYN CYCLE's TRIUMPH franchise and seized all of the TRIUMPH motorcycles which BROOKLYN CYCLE then and there had for sale effectively terminating BROOKLYN CYCLE's franchise in violation of Federal and State Law."

### I—*The Triumph Counterclaim Against De Salvatore*

Leaving aside for the moment the question of the above-indicated alleged justification for failure to pay Triumph's claim, and the questions of possible set-off and secondary liability, it is clear that summary judgment should also be granted as to Triumph's counterclaim against De Salvatore in its answer and counterclaim in the second of the above-entitled actions. In essence, this counterclaim is for conversion and misapplication of the $13,135.55, plus interest, owed to Triumph.

As President of Brooklyn Cycle Mr. De Salvatore signed the Security Agreement entered into by Brooklyn Cycle and G.A.C. on November 5, 1971, pursuant to which G.A.C. acquired a security interest in Brooklyn Cycle's inventory and equipment (i. e., the motorcycles) and in all cash and noncash proceeds arising out of the sale of that inventory and equipment.

While Mr. De Salvatore, as President of Brooklyn Cycle, was supervising its operation, G.A.C. financed the 11 motorcycles identified in paragraph 11 above, which Brooklyn Cycle "sold out of

trust", disposed of the motorcycles in the course of business but failed to forward the proceeds which it had agreed to hold in trust to G.A.C. for repayment of the outstanding and then overdue loans. Mr. De Salvatore, with knowledge of G.A.C.'s security interest in the Triumph motorcycles and the proceeds received from the sale thereof, was unquestionably disbursing Brooklyn Cycle's funds to others and to himself.

By reason thereof, Mr. De Salvatore is unquestionably personally liable for the $13,135.35 loaned and not yet repaid. *Santa Barbara v. Avallone & Miele, Inc.,* 270 N.Y. 1, 199 N.E. 777 (1936); *Hinkle Iron Co. v. Kohn,* 229 N.Y. 179, 128 N.E. 113 (1920); *Armour and Co. v. Celic,* 294 F.2d 432 (2d Cir. 1961).[1]

### II—*The Brooklyn Cycle and De Salvatore Claims*

In response to Triumph's complaint, Brooklyn Cycle interposed an answer with nine counterclaims which it later increased in an amended answer to eleven counterclaims and also later Mr. De Salvatore commenced an action against Triumph containing two additional claims but which also may be regarded in effect as counterclaims.

We note preliminarily that the Third, Fifth, Seventh and Ninth of such counterclaims and the first claim (or counterclaim of Mr. De Salvatore) in the second action are linked in that all concededly are dependent on the claim by Brooklyn Cycle and Mr. De Salvatore that Triumph's termination of the dealership franchise of Brooklyn Cycle was unlawful and illegal. If such is not the case, these claims, of necessity, must fail.

### A. *The First Counterclaim*

Brooklyn Cycle's first counterclaim is predicated upon an alleged violation of 15 U.S.C. § 1221, *et seq.,* which is entitled the "AUTOMOBILE DEALER SUITS AGAINST MANUFACTURERS ACT" or the "AUTOMOBILE DEALER ACT".

In striking "motorcycles" from the Act the House of Representatives Committee on the Judiciary stated as follows:

"The words 'or other automotive vehicles' which appeared in section 1(a) of the bill passed by the Senate have been stricken in order to limit the bill's coverage to manufacturer-dealer transactions involving the distribution of passenger cars, trucks, and station wagons. *The amendment, therefore, excludes transactions involving* buses, tractors, *motorcycles,* and other transportation vehicles propelled by power. This accomplishes two purposes: First, it avoids any ambiguity resulting from use of the phrase 'or other automotive vehicles'; second, it restricts the bill to those areas of automotive distribution in which congressional committees have ascertained a present need for remedial legislation." H.R.Rep.No. 2850, 84th Cong., 2d Sess. as reported in 1956 U.S.Code Cong. & Admin.News pp. 4596, 4601. (Emphasis added.)

At least one court has dismissed an action brought under the Automobile Dealer Act by a mobile home dealer against the manufacturer of motor homes on the basis of this legislative history and the aforeindicated specific exclusion, stating:

"Thus, the Congress expressly considered including manufacturers of buses, tractors, motorcycles, and other motor vehicles within the purview of the Act. These arguably analogous industries were purposely excluded from reach of the statute. Judicial construction of the Act should be consistent with this narrow congressional intent. . . ." *River Oaks Motor Homes, Inc. v. Winnebago Industries, Inc.,* 371 F.Supp. 137, at p. 140 (S.D. Tex.1974).

---

1. The recent case of *Independence Discount Corp. v. Bressner,* 47 A.D.2d 756, 365 N.Y.S.2d 44 (2d Dept. 1975), is also consistent with this conclusion. The Court in *Bressner* would hold a defendant liable where, as here, the Trust Agreement required that trust funds be kept separate from general funds.

■ Brooklyn Cycle's answer to this argument by Triumph on this motion was to state in paragraph 1 of its counterstatement of material facts pursuant to General Rule 9(g) that: "Upon information and belief, Triumph is also engaged in the sale of automobiles, automobile parts and accessories." However, Brooklyn Cycle furnishes nothing by way of affidavit or other evidence in support of this bald assertion and hence the same will be disregarded for the purposes of this motion. Moreover, there were no automobile transactions between Triumph and Brooklyn Cycle and hence even if the Act were applicable to Triumph with respect to other dealers, it would clearly appear not to be applicable to it insofar as Brooklyn Cycle is concerned.

Accordingly, it is clear that Triumph is entitled to summary judgment with respect to Brooklyn Cycle's first counterclaim as a matter of law.

B. *The Second and Other Related Counterclaims*

In its second counterclaim Brooklyn Cycle repeats all of the allegations in its first counterclaim and then alleges that "plaintiff breached a written franchise agreement with the defendant".

Both parties appear to agree that the alleged breach is further predicated on one or more of the following: (i) a failure to supply motorcycles; (ii) improper repossession of motorcycles; and/or (iii) improper termination of the Dealer's Sales Agreement.

(i). *Allegations that motorcycles were not supplied*

The first of these bases also forms in part a basis for Brooklyn Cycle's Tenth counterclaim wherein it is alleged that Triumph represented and warranted that it would supply a substantial and sufficient number of motorcycles to meet Brooklyn Cycle's sales needs and to enable Brooklyn Cycle to operate the franchise profitably, and that these "representations were false, fraudulent, illegal and untrue, and were made in bad faith".

The difficulty the Court has with this allegation of fraud is that Brooklyn Cycle has produced no proof in support thereof on this motion. At best its counsel on this motion is able to argue in his brief that "De Salvatore * * * said that he was never told that motorcycles were unavailable" and "someone must have represented that motorcycles were available". Such speculation is not sufficient on a motion for summary judgment of this kind to raise an issue of fact on this question, particularly in the light of the express terms of the written Dealer's Sales Agreement between the parties concerning the supply of motorcycles, viz.:

> "Company [Triumph] will supply dealer [Brooklyn Cycle] at prevailing Dealer prices established by Company and in effect on date of shipment with such Triumph products [motorcycles, parts and accessories] as may be reasonably required by Dealer, *but only insofar as Company is able to do so,* taking into consideration the total requirements of other dealers and supplies of Triumph products on hand." (Dealer Sales Agreement, 1/16/71, ¶ 8(b); Renewal Agreement, 1/20/72, ¶ 8(b).) (Emphasis added.)

■ Not only does this provision of the agreement between the parties negative Brooklyn Cycle's present claim of misrepresentation but it also limits Triumph's obligation to supply Brooklyn Cycle with motorcycles to Triumph's ability to do so, taking into consideration the total requirements of other dealers and the supply of products on hand.

No proof or evidence of any kind was produced showing or tending to show that Triumph had, taking into consideration the requirements of others, an ability to supply motorcycles but nevertheless failed or refused to meet the reasonable requirements of Brooklyn Cycle. On the contrary, all the evidence and proof submitted on this motion showed that there were "not * * * enough motorcycles to supply existing dealers".

Despite the proof with respect to these shortages, the proof also showed that

Brooklyn Cycle had at least 17 Triumph motorcycles on hand on January 15, 1973 when G.A.C. allegedly repossessed Brooklyn Cycle's security inventory. These facts also tend to belie that portion of Brooklyn Cycle's claim of a breach of the Dealer Sales Agreement by reason of a failure to supply a sufficient number of motorcycles.

#### (ii). *Allegations that motorcycles were wrongfully repossessed*

As its second basis for Triumph's breach of its dealer agreement with it, Brooklyn Cycle alleges that "on or about January 15, 1973 * * * [Triumph] seized motorcycles belonging to [Brooklyn Cycle] at [Brooklyn Cycle's] premises in Brooklyn, New York * * * *" and Triumph "acted in the utmost of bad faith and breached the written franchise agreement and made it possible for the defendant to continue its operation as an authorized franchise dealer".

■ The proof shows, however, and it is conceded, that the repossession of 17 Triumph motorcycles which took place on January 6, 1973 was done by G.A.C. in accordance with and under the terms of its security agreement with Brooklyn Cycle. At the time of the repossession Brooklyn Cycle was in default on repayment of its debt to G.A.C., and under paragraph 8 of their agreement G.A.C. was entitled to repossess, viz.:

"In the event of Debtor's [Brooklyn Cycle's] default under this Agreement:

(a) Company [G.A.C.] shall have the right at such time to take possession of any equipment, inventory[2] and cash, and non-cash proceeds generated from the sale thereof then in the possession of Debtor or wherever found, and for such purpose Company, together with its duly authorized representatives, may enter the premises of Debtor."

In its Sixth counterclaim Brooklyn Cycle further claims that such seizure by G.A.C. was unlawful and illegal in that a hearing should have been held before any such seizure should have taken place, citing *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W. T. Grant Company,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), and CPLR § 7102(d). None of these authorities, however, are applicable here.

The Court is at a loss to understand how a contractually authorized repossession on default by G.A.C. can constitute a breach of an entirely separate agreement by Triumph. It certainly does not constitute any basis for all the other allegations of "bad faith", "outright violation of the law" and "unlawful" and "illegal" conduct on the part of Triumph.

Parenthetically it might be noted that this sort of shot-gun approach by Brooklyn Cycle certainly does not inspire much confidence in the validity of its claims.

#### (iii). *Allegations that the franchise was wrongfully terminated*

As its third basis for its Second counterclaim and as its primary basis for its Third, Fifth, Seventh and Ninth counterclaims and Mr. De Salvatore's first claim in his complaint in the second action, Brooklyn Cycle alleges that Triumph's termination of the Dealer's Sales Agreement breached that Agreement and was unlawful.

■ Brooklyn Cycle's counsel argues at length with respect to the validity of the thirty-day termination clause in the Agreement between the parties and also claims that "no thirty-day cancellation notice was ever given to" Brooklyn Cycle. Apart from the fact that such clauses apparently have been held valid under New York law and enforceable under General Business Law § 197 *et seq.* (*Cycleway, Inc. v. Kawasaki Motors Corp.,* 77 Misc.2d 829, 354 N.Y.S.2d 812 (Sup.Ct. Oneida Co. 1974), Triumph points out and relies on the fact that the Agreement "was terminable immediately in the event of a breach of the agree-

---

**2.** The Security Agreement defines inventory as "all Triumph motorcycles sold and/or distrib- uted by Birmingham Small Arms Co. Inc. and owned or acquired by Brooklyn Cycle."

ment" and that as of January 9, 1973, the date Triumph notified Brooklyn Cycle of the termination, Brooklyn Cycle was in breach of several of the covenants of the Agreement.

In the first place, Triumph says the Agreement expressly provides that:

Company [Triumph] may terminate this agreement forthwith * * *:

" * * * If dealer (Brooklyn Cycle) fails to develop the sales potential of his locality". 

Mr. De Salvatore testified that Brooklyn Cycle's Triumph dealer sales outlet was inoperative from August, 1972, until the termination of the Dealer's Sales Agreement.

In the second place, the dealer Agreement provides that:

"Company may terminate this Agreement forthwith * * *:

" * * * if by attachment proceeding, injunctions, or in any legal process, Dealer's business becomes substantially inoperative in the judgment of Company * * * "

As heretofore indicated, Brooklyn Cycle was in default on loans made to it by G.A.C. which were guaranteed by Triumph and under its Security Agreement with Brooklyn Cycle, G.A.C. proceeded to repossess Brooklyn Cycle's inventory of Triumph motorcycles. This action, of course, confirmed the fact that Brooklyn Cycle's business had become substantially inoperative.

Thirdly, Triumph says the Agreement provided that:

"Company may terminate this Agreement forthwith * * *:

"if Dealer * * * is in default under any obligation of debts due to Company, or should Dealer's account with Company become delinquent * * * "

Triumph maintains that Brooklyn Cycle's default on the repayment of the G.A.C. loans was a default on its obligation to Triumph since Triumph had guaranteed such loans.

Brooklyn Cycle argues (i) that Triumph's termination was in violation of General Business Law § 197 in that such termination was without cause; (ii) that in its notice of termination letter Triumph stated the cause of termination only to be an inadequate sales performance on Brooklyn Cycle's part; (iii) that under the agreement Brooklyn Cycle was not required to sell any motorcycles and (iv) that Mr. Backity, Triumph's representative, admitted that there was no performance standard required by Brooklyn Cycle under the agreement.

Many of these arguments seek only to avoid the basic question, namely: whether Triumph was entitled under the above-quoted portions of its Agreement to terminate the Agreement forthwith in view of the default, repossession, and inoperability of Brooklyn Cycle. There would seem to be no real question but that Triumph was so entitled.

In its Eleventh counterclaim, Brooklyn Cycle appears to reassert the first of the foregoing arguments and again assuming that General Business Law § 197 is applicable herein, the essential question is whether the default, the repossession and the inoperability with respect to Brooklyn Cycle constituted cause. As indicated, there is no question but that they do.

**C.** *The Third and Fourth Counterclaims*

With respect to the Third and Fourth counterclaims of Brooklyn Cycle, insofar as they are predicated upon "the unlawful termination and cancellation of the franchise and breach of the written franchise agreement, as hereinbefore alleged", they too must fail. Brooklyn Cycle also appears to allege in these two counterclaims that there was an "oral agreement" that the plaintiff and defendant "would enter into a written franchise agreement" and that Brooklyn Cycle did in fact rely thereon and various "false, fraudulent and untrue" representations by Triumph and expended sums of money thereon "when in fact, the defendant (Brooklyn Cycle) did not receive a franchise to sell said motor vehicles until approximately six months had elapsed".

We note first that the language of the counterclaim itself fails to state a claim upon which relief could be granted. In effect, the counterclaim alleges:

a) that Triumph promised Brooklyn Cycle a franchise;

b) that Brooklyn Cycle relied on the promise; and

c) that six months later the franchise was granted.

Such allegations could hardly support relief.

But in his memorandum in opposition to this motion, counsel for Brooklyn Cycle argues that Brooklyn Cycle was promised that it would *immediately* obtain a franchise, and that damages are due from Triumph for its failure to supply the franchise as so promised.

■ However, no evidence, affidavits or any proof of any kind has been produced to sustain counsel's belatedly advanced argument. The most that Brooklyn Cycle had produced in the face of this motion for summary judgment to prove the existence of this alleged oral agreement is a statement by Mr. Backity that it was a "foregone conclusion that [Brooklyn Cycle] would obtain a Triumph franchise." That, of course, eventually occurred. No other details of the alleged agreement are specified. This lack of evidence is fatal to Brooklyn Cycle's position on a motion for summary judgment. The fact that Brooklyn Cycle may have incurred expenses in anticipation of eventually obtaining a franchise agreement is, of course, not chargeable to Triumph unless Triumph specifically authorized, approved and agreed to reimburse the same.

### D. *The Fifth Counterclaim*

Brooklyn Cycle's Fifth counterclaim appears clearly to be predicated upon the alleged unlawful and illegal termination of the franchise agreement which claim of Brooklyn Cycle, as indicated, has not been sustained. Accordingly, this counterclaim must also fail.

### E. *The Sixth and Seventh Counterclaims*

For reasons indicated above, the Sixth counterclaim must fail and the Seventh counterclaim again is predicated upon the alleged "unlawful", "illegal" and "wrongful" cancellation and termination of the franchise agreement and it too must fail.

### F. *The Eighth Counterclaim*

Brooklyn Cycle's Eighth counterclaim alleges that during the time that it was an authorized franchise dealer it performed "substantial amounts of warranty, service and repair work, labor and services and furnished materials to and for" Triumph, for which it had not been paid in the amount of $3700.

■ Despite the fact that both sides have had extensive pretrial discovery and an opportunity to produce evidence in support of their claims, Brooklyn Cycle offers nothing at this time to sustain this claim other than the fact that Mr. Backity testified "that he reviewed the warranty forms and found them to be excessive but that he took no action with respect to those excessive warranty claims". From this Brooklyn Cycle asks that the jury be permitted to infer that Brooklyn Cycle performed warranty service and repair work for which it had not been reimbursed. This is not enough to sustain a claim for work, labor and services which would have to have been performed at the "special instance and request" of Triumph. Accordingly, this counterclaim too must fail.

### G. *The Remaining Claims*

Since the Ninth counterclaim of Brooklyn Cycle is also predicated upon the alleged "unlawful", "illegal" and "wrongful" termination of the Dealer Sales Agreement, it must also fail. And the Tenth and Eleventh counterclaims must fail for the reasons heretofore indicated. The same is true with respect to the first claim of Mr. De Salvatore in the second action which is predicated upon the alleged "unlawful and illegal

termination of the dealership franchise of Brooklyn Cycle, Inc.".

To the extent that the second claim of Mr. De Salvatore in the second action pertains to alleged false, fraudulent and untrue representations concerning the supply of motorcycles and the alleged unlawful and wrongful termination of the dealership agreement, these issues have already been fully discussed above. In addition thereto, in this claim it is alleged that the defendant (Triumph) represented to the plaintiff (De Salvatore) that if De Salvatore terminated his job as a police officer employed by the City of New York the franchise would be allowed to continue and that these representations were "false, fraudulent and untrue and at the time they were made, the defendants knew that these representations were false, fraudulent and untrue" and that the defendants knew the plaintiff would rely thereon and the plaintiff did in fact rely thereon, and expended large sums of money to develop the franchise in reliance thereon.

As Triumph points out in its memorandum, since Mr. De Salvatore terminated his employment with the New York City Police Department in 1971, the alleged representations were presumably made in 1971. However, as Triumph further points out "if such a representation was made in 1971, the renewal of the dealer sales agreement in January, 1972, would have fulfilled such a representation." Accordingly there does not appear to be any basis for this claim also.

### III—*Conclusion*

In conclusion, despite the myriad of counterclaims and claims interposed by Brooklyn Cycle and Mr. De Salvatore in response to Triumph's attempt to recover the $13,135.35 concededly owing to it, there does not appear to be any substance to any of them for the reasons heretofore indicated and therefore Triumph's motion for summary judgment must be and the same hereby is granted, and Brooklyn Cycle and Mr. De Salvatore's counterclaims and claims, respectively, must be and the same hereby are dismissed.

Submit judgment.

So ordered.