**TWO WHEEL CORP. d/b/a Honda of Mineola, Plaintiff,**

v.

**AMERICAN HONDA CORPORATION, Defendant.**

No. 79 C 3064.

United States District Court,
E. D. New York.

March 19, 1980.

Meltzer, Lippe & Goldstein by Richard A. Lippe, Mineola, N. Y., for plaintiff.

Lyon & Lyon by Roland N. Smoot, Robert C. Weiss, Allan W. Jansen, Los Angeles, Cal., for defendant.

### DECISION AND ORDER

BRAMWELL, District Judge.

When a national distributor of goods entrusts the local sale of such goods to a small dealer, the distributor must accept the economic reality that it cannot completely control the activity of the independent local outlet. The extent of the dealer's independence, therefore, may become a source of friction between the contracting parties. This case evolves from the plaintiff Honda of Mineola's claim that this friction has manifested itself in the termination of its Honda dealership.

Being of the belief that the defendant lacked a valid basis for terminating its dealership, the plaintiff filed the instant action which attacks both the motive behind, and the grounds for, the defendant's discontinuance of its status as a Honda dealer. This Decision and Order concerns the plaintiff's motion for a preliminary injunction in that action.

On December 3, 1979, the plaintiff asked this Court to temporarily restrain the termination of its dealership. After hearing

oral argument by representatives of the parties, the Court acceded to the plaintiff's request. The parties then set forth their positions with respect to the instant motion in detail during a six (6) day hearing held on December 13, 17, 18, 19, 20 and 21 of 1979. Pursuant to Fed.R.Civ.P. 52(a), the Court's evaluation of the evidence elicited at this lengthy hearing, and its disposition of the instant motion, will be rendered in the form of Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I. *The Parties*

1. The plaintiff Two Wheel Corp. d/b/a Honda of Mineola is a New York corporation (Complaint, par. 4).

2. The defendant American Honda Corporation is a California corporation with its principal place of business in Gardena, California (Complaint, par. 6).

3. The defendant is the exclusive United States distributor of motorcycles manufactured in Japan by its parent corporation Honda Motor Corp. Ltd. (Complaint, par. 6).

4. These motorcycles are distributed by the defendant in the United States through a network of approximately 1750 dealers (Complaint, par. 6).

### II. *The Evolution of Honda of Mineola*

5. In 1965, the plaintiff, through its president and principal stockholder Morris Zegarek, entered into a written agreement with the defendant pursuant to which the plaintiff became a dealer for the sale, servicing and assembly of Honda motorcycles (15).* No provision in this agreement forbids a Honda dealer from selling non-Honda parts and accessories (*See* Pl. Ex. 2).

6. The plaintiff established its original facility at 529 Jericho Turnpike, Mineola, N. Y. (88).

7. In 1970 or 1971, the plaintiff moved its facility to 336 Jericho Turnpike, Mineola, N. Y. (88).

8. Until September 20, 1979, the plaintiff conducted a "full service-sales motorcycle operation" at 336 Jericho Turnpike (88).

9. Over the last 15 years, this operation has constituted Mr. Zegarek's sole business activity and has been the sole source of support for his family (14).

10. Mr. Zegarek presently is 58 years of age (12).

11. During the course of the contractual relationship between the plaintiff and the defendant, the plaintiff established an excellent financial record, while maintaining in good standing a $700,000 line of credit at a local bank (178).

12. In 1977, 1978 and 1979, the plaintiff ranked number one in sales of Honda motorcycles in the region comprising New York, New Jersey, Connecticut, Vermont, Pennsylvania, Rhode Island, Maine, and Massachusetts. (70–72, Pl. Ex. 6, 7).**

13. Pursuant to a lease dated July 7, 1971 (Pl. Ex. 11), the plaintiff, from 1971 on, began to operate a facet of its business at 344 Jericho Turnpike, Mineola, N. Y. (91). 344 Jericho Turnpike is located across the street from 336 Jericho Turnpike (88).

14. The lease agreement entered into between the plaintiff and the lessor of 344 Jericho Turnpike contains the following provision:

> Tenant shall use and occupy premises for selling storing and servicing of automobiles, motorcycles and accessories.

(94, Pl. Ex. 11).

15. This activity at 344 Jericho Turnpike included servicing and assembly of motorcycles (94), and motorcycle storage (318).

16. Although disputed by the testimony of a former employee of the plaintiff (527), and by a representative of the defendant (805), Mr. Zegarek testified that some mo-

---

* Throughout the course of this Decision and Order, the numbers within parentheses denote reference to the transcript of the Hearing held in this matter.

** "Pl. Ex." denotes reference to the exhibits introduced into evidence by the plaintiff during the Hearing before this Court.

torcycle display (323), and a few motorcycle sales took place at 344 Jericho Turnpike between July 7, 1971 and September 20, 1979.[1]

17. No written document evidences the extent of the plaintiff's use of 344 Jericho Turnpike before September 20, 1979 (351).

18. Mr. Zegarek testified that the defendant was aware of the plaintiff's use of 344 Jericho Turnpike because:

(a) Between July 7, 1971 and September 20, 1979, the defendant delivered merchandise to the 344 Jericho Turnpike location (95).

(b) In May or June of 1979, Tony Ferente, a representative of the defendant's lawn mower division, visited the 344 Jericho Turnpike location with an eye toward sanctioning a Honda lawn mower showroom at that site (102–03).

(c) The 344 Jericho Turnpike location periodically has been visited by representatives of the defendant since 1971 (96, 347, 380).

19. On September 20, 1979, the plaintiff's facility at 336 Jericho Turnpike burned to the ground, apparently as a result of arson (90). Mr. Zegarek had procured fire insurance on the 336 Jericho Turnpike location (374).

20. After the September 20, 1979 fire, the plaintiff transferred its entire operation to the 344 Jericho Turnpike location (90).

21. At a cost of over $80,000, the plaintiff has made extensive improvements to the 344 Jericho Turnpike location in an attempt to conform it to the defendant's facility requirements (97).

22. In its renovated condition, the 344 Jericho Turnpike facility contains over 2000 square feet of showroom area in total and 1600 square feet of service area (98–100).[2]

23. Mr. Zegarek testified that the 344 Jericho Turnpike is comparable to, or larger than, the facilities employed by other Long Island Honda dealers (98–101, Pl. Ex. 12; see also Def. Ex. I).\*\*\*

24. On October 5, 1979, the defendant refused to accept further motorcycle orders from the plaintiff (105–07).

25. Mr. Zegarek's inquiries with respect to this situation disclosed that the plaintiff had been placed on "Code 1" status as a result of the move to 344 Jericho Turnpike (107).

26. Mr. Zegarek testified that representatives of the defendant assured him that the problems would be straightened out after a technical computer alteration (107).

27. Five days later, Winston Farrington, the defendant's sales representative (801) visited the 344 Jericho Turnpike facility (109, 803).

28. Mr. Zegarek testified that, during the course of his visit, Mr. Farrington gave a "verbal approval" for the use of 344 Jericho Turnpike as a Honda facility. This apparently occurred after Mr. Farrington heard Mr. Zegarek's renovation plans for the building (109, 477, 480, Pl. Ex. 30, Def. Ex. J).

29. Mr. Farrington, however, testified that he did not officially recommend to the defendant that the use of 344 Jericho Turnpike be approved (804). A report written by Mr. Farrington supports this testimony (Def. Ex. AI, AK).

30. Steven Sabatini, defendant's District Service Manager (818) also testified that he did not approve the 344 Jericho Turnpike facility as an authorized Honda location after the fire (821).

31. Between September 20, 1979 and November 21, 1979, the plaintiff did not receive motorcycles, "special factory tools, special engine tools, special parts, service manuals" and other necessary manuals from the defendant (151–66).

---

1. Most of the sales that took place at 344 Jericho Turnpike were for wholesale and overseas customers (327).

2. 344 Jericho Turnpike presently has 1500 square feet of showroom space on its first level. There will be 500–800 square feet of additional showroom space on the upstairs level (98).

\*\*\* "Def. Ex." denotes reference to the Exhibits introduced into evidence by the defendant during the Hearing before this Court.

32. Between September 20, 1978 and December 17, 1978, the plaintiff sold 100–150 motorcycles; between September 20, 1979 and December 17, 1979, the plaintiff sold 15 motorcycles (165).

33. As a result of the defendant's failure to respond to the plaintiff's requests for motorcycles and parts, customers of the plaintiff cancelled numerous orders (132–46, Pl. Ex. 13, 14, 15, 16, 17).

34. Citing the plaintiff for operating out of an unauthorized location, for submitting false claims, for disregarding local law and for poor set up of motorcycles, the defendant terminated the plaintiff's dealership status on November 21, 1979 (Pl. Ex. 1).

### III. *The False Claims Issue*

35. Pursuant to the Honda Dealer's Agreement, claims by a Dealer for damage to shipped motorcycles occurring during shipment to the dealer are honored by American Honda (774).

36. Similarly, when a crate containing a motorcycle does not evidence damage, but the motorcycle within the crate is damaged upon reaching the dealer, American Honda honors a dealer's claim for concealed shipping damage (775).

37. The dealer, however, possesses responsibility for damage to motorcycles arising out of incidents that occur at the dealer's facility (944).

38. Michael Karlin, service manager at Honda of Mineola from September or October of 1977 until March or April of 1978 (506), testified that Mr. Zegarek authorized him to record the plaintiff's in house damage as concealed shipping damage so that the defendant would pay for the loss (504, 515). Mr. Karlin also testified that the plaintiff submitted duplicate shipping claims to American Honda (513, 515).

39. Mr. Karlin testified that the overcrowded nature of 336 Jericho Turnpike's storage facilities (502, 510, 520) and the transportation by forklift of motorcycles from 336 to 344 Jericho Turnpike (520) caused numerous motorcycles to fall and to be damaged on the plaintiff's premises.

40. Mr. Karlin, however, testified to only one specific submission of an allegedly false shipping claim (509).

41. Prior to his employment by the plaintiff, Mr. Karlin worked at a Volvo dealer for 3 years (536). After having words with his employer, he was asked to leave this job (534).

42. Mr. Karlin also worked at a Suzuki dealer before being hired by the plaintiff (541); after asking for more money, he also was discharged from this position (542, 563).

43. Mr. Zegarek testified that, during Mr. Karlin's last two months at Honda of Mineola, he neglected paper work,[3] spent excessive time on personal phone calls and occasioned customer complaints because of his false promises (868).

44. Mr. Zegarek added that Mr. Karlin had financial difficulties during his employment with the plaintiff (869, 891).

45. Mr. Zegarek testified that he fired Mr. Karlin (869).

46. Conceding that, in most cases, he cannot tell when shipping damage to motorcycles occurs (947) due to the practical problems inherent in making such a determination (916), Mr. Zegarek testified that he "never instructed anyone at Honda of Mineola to make out a false shipping claim" (921).

47. Mr. Zegarek also noted that if motorcycles fall from forklifts at Honda of Mineola, they are examined to determine if such a fall occasioned damage (917–18).

48. Deposition testimony by Jeffrey Prince (Pl. Ex. 33) and the testimony before this Court of Sam Cohen (955) corroborate

---

**3.** Mr. Zegarek introduced evidence tending to prove that, during Mr. Karlin's period of employment at Honda of Mineola, a minimal number of shipping claims actually were submitted to American Honda and that this number fell far below the plaintiff's norm (888). Through its interpretation of the plaintiff's monthly shipping claim statistics over an extended period of time, the defendant attempted to rebut Mr. Zegarek's testimony (Def. Ex. AB, AD, AE).

Mr. Zegarek's testimony. Mr. Prince and Mr. Cohen have served in the plaintiff's employ (Pl. Ex. 33, 951).

49. Mr. Karlin also testified that the plaintiff submitted warranty claims to the defendant for Yuassau batteries when, in fact, AMB batteries were sold to the customer (523). Yuassau batteries are covered by American Honda's warranty; AMB batteries are not (523).

50. Mr. Karlin added that Mr. Zegarek had obtained the franchise for the AMB batteries (523). The AMB batteries cost less than the Yuassau batteries (526, 940).

51. Mr. Zegarek, however, explained that the enactment of local laws mandating that motorcycles travel with their headlights on caused a run on batteries (893). Since the defendant could not supply an adequate number of Yuassau batteries, the plaintiff sold the available AMB batteries instead (462, 896, Def. Ex. U).

52. In this regard, Mr. Zegarek testified that in no case did the plaintiff ever supply an AMB battery to a customer "without his knowledge of it and without his option to replace it" with a Yuassau (896).

53. No representative from American Honda ever has advised the plaintiff of its belief that false shipping or false warranty claims have been submitted by the plaintiff (211, 789, 808, 817, 919).

54. In early 1978, as a result of a burglary, the plaintiff made 123 claims to its insurance broker for damage valued at $6,096 (195–201).

55. Three of these insurance claims were submitted on items previously claimed to the defendant under the rubric of shipping damage (203–08).

56. Mr. Zegarek testified that this duplicate filing of claims resulted from inadvertance (205), and that he had withheld receipt of payment on the entire insurance claim until the discrepancy was ironed out (210–11).[4]

IV. *The Plaintiff's Relations with the Village of Mineola*

57. Throughout the plaintiff's tenure in Mineola, residents of the Village have complained to their public officials and to the defendant about the noise and the element incidental to, and attracted by, the plaintiff's business (220, 241, 251–52, 667, 668, 679, Def. Ex. A, C, E, AA).

58. In 1971, Byron F. Katz, a Mineola trustee asked the plaintiff to minimize motorcycle activity through the rear of 336 Jericho Turnpike where a residential area is located (214). By utilizing front entrances, the plaintiff complied with this request (215).

59. As the years went by, the Village made similar demands concerning hours of operation, deliveries, business traffic and employee parking (215–16).

60. In 1974, the Village issued the plaintiff a number of summonses for violation of noise and access ordinances; these eventually were dismissed (220–25, Pl. Ex. 25).

61. During the course of 1977 and 1978, the Village issued the plaintiff and Mr. Zegarek over 100 summonses for alleged improper conduct in the course of operations (226, 606). The plaintiff was found guilty on two of these summonses, which presently are on appeal (226, 607). Mr. Zegarek was found not guilty on the summons with which he was charged (226).

62. In 1978, the Village of Mineola instituted an action against Honda of Mineola that sought to enjoin its use of 255 Jericho Turnpike as a warehouse for its unsold motorcycles. Honda of Mineola prevailed (228, Pl. Ex. 27).

63. After the September 20, 1979 fire, the Village of Mineola sought to enjoin the owner of 336 Jericho Turnpike from insti-

---

4. Although they have not been established to the satisfaction of this Court, several other claimed incidents of fraud allegedly committed by the plaintiff should be mentioned in passing. Several of these involve the plaintiff's alleged sale of motorcycles in crates, *see* Def. Ex. H, a practice prohibited by American Honda. Although evidence concerning such practices was not prominently displayed at the hearing before this Court, one such sale appears to have been the subject of Small Claims Court litigation (Def. Ex. V).

tuting necessary repairs to the structure of the building (232). Judgment was rendered against the Village (234, Pl. Ex. 28).

64. After the September 20, 1979 fire, the Village of Mineola sought to enjoin Honda of Mineola from using 344 Jericho Turnpike for the purpose of selling motorcycles (236, 609, Pl. Ex. 29). A motion by the Village for a preliminary injunction in this action was denied (237, 624).

65. The local law that forms the basis for the Village's case in the action against Honda of Mineola's use of 344 Jericho Turnpike became effective in 1976 while Honda of Mineola actually was using 344 Jericho Turnpike (608).

66. In late 1979, the Village of Mineola issued violations to Honda of Mineola for its resurrection of a sign in front of 344 Jericho Turnpike and for its installation of heaters and air conditioning in the facility without a permit or a variance (238, 611). No decision in this matter has been rendered (239).

67. In several instances, laws drafted by the Village of Mineola designed to affect Honda of Mineola have been vetoed by New York State officials as being outside the scope of the Village's jurisdiction (Pl. Ex. 32, 629).

68. The Mayor of Mineola testified that the plaintiff's business has created a "problem" in the Mineola community (667, 671).

69. The Mayor, however, drew no distinction between Honda of Mineola and American Honda (678, 680, 681). In fact, the Mayor testified that the nature of the plaintiff's business provided the true source of the friction between the plaintiff and the neighboring community (679, 684, 686).

70. Mr. Zegarek explained his "problem" with the Village by citing the following:

(a) The fears of the Mineola residents of the stereotypical motorcycle consumer (264–69, Pl. Ex. 24)

(b) Mr. Zegarek's belief that the public officials of Mineola represent not the businessmen of the community, but the residents who vote (254)

(c) the fact that the plaintiff does not purchase insurance from "the right people" (263)

(d) the Village's failure to accept in good faith efforts to compromise offered by the plaintiff (296–99).

V. *Custom Accessories, Motorcycle Safety and Motorcycle Setup at Honda of Mineola*

71. Pursuant to the Honda Motorcycle Dealers Agreement (Pl. Ex. 2), dealers of American Honda are required to set up or assemble motorcycles before displaying them to the customer (771–72, Pl. Ex. 2). Before motorcycles are delivered to a purchaser, other procedures must be followed (77, 771, Pl. Ex. 9).

72. These requirements are designed to ensure that a purchaser of a Honda motorcycle receives the motorcycle in a safe condition.

73. On several occasions during his extensive testimony before this Court, Mr. Zegarek expressed an overriding concern for his customers and for motorcycle safety (62, 249, 300, 354. *See* Def. Ex. R, V).

74. Donald Keller, customer service manager for the defendant (766) expressed his belief that the plaintiff ranked poorly in the Honda network with respect to customer complaints (787). Mr. Keller based this belief on "general conversation" among the defendant's customer relation staff (795).[5]

75. On cross examination of Mr. Keller, plaintiff's counsel established that Mr. Keller's appraisal of the plaintiff's customer relations did not take into account the ratio of the number of customer complaints received to the volume of the plaintiff's sales (795).

76. Between 1973 and 1979, the plaintiff's manner of motorcycle set up has occasioned representatives of the defendant to file 9 formal deficiency notices (73) during

---

5. To corroborate Mr. Keller's testimony, the defendant introduced Def. Ex. AH consisting of documents containing customer complaints concerning Honda of Mineola. Of the 46 such documents found within Def. Ex. AH, however, a number of these documents were duplicates.

the course of their visits to the plaintiff (76, Pl. Ex. 8).

77. These 9 reports cited 187 separate deficiencies on 114 [6] display motorcycles (Pl. Ex. 8).[7]

78. Mr. Keller, the defendant's customer service manager (766), testified on his direct examination that, of the 1750 dealers in the Honda network, the plaintiff placed as the worst with respect to motorcycle set up (773, 786).

79. On cross examination of Mr. Keller, however, plaintiff's counsel established that Mr. Keller's appraisal of the plaintiff's set up record did not take into account the ratio of plaintiff's deficiencies to plaintiff's sales volume, and that Mr. Keller had no actual knowledge of the number of the plaintiff's deficiencies for 1977, 1978 or 1979 (797).

80. The plaintiff and the defendant have argued over the set up issue in the past (Def. Ex. N, O, P).

81. Troubled by the plaintiff's set up record, defendant's counsel visited the plaintiff's facility on December 13, 1978 (419, Def. Ex. Q). During the course of said visit, defendant's counsel warned the plaintiff that if his set up performance did not improve, a lawsuit would be instituted by American Honda against Honda of Mineola (420).

82. Mr. Zegarek testified that, during the December 13, 1978 meeting, defendant's counsel advised him that American Honda would rather have the plaintiff sell less motorcycles if that would ensure conformity with American Honda requirements (487).[8]

83. Apparently unsatisfied with the plaintiff's conduct after the December 13, 1978 meeting, American Honda commenced an action against Honda of Mineola in this Court (79 Civ. 562) on March 24, 1979 for breach of contract, and for a declaratory judgment.

84. Efforts were made to settle this action. *See* Def. Ex. L.

85. 47 of the deficiencies cited in the 9 reports that instigated the prior action in this Court concerned throttle cable routing; 55 of these deficiencies concerned loose speedo or tach cable nuts; 6 of the deficiencies concerned custom parts (Pl. Ex. 8, *see also* Def. Ex. M).

86. Mr. Zegarek explained that the constant interchange of custom parts on display motorcycles in the plaintiff's showroom caused these particular deficiencies (82–83, 366, 402), which account for over 50% of the total cited deficiencies because:

(a) The use of custom parts on Honda motorcycles necessitates a change in the throttle cable routing required by American Honda (51, 58, 405);

(b) the display motorcycles must have loose nuts in order to accommodate heavy customer traffic and to meet customer demands to view custom parts (60–62).

87. Almost 95% of the custom parts sold by the plaintiff as incidents to the sale of Honda motorcycles are not manufactured by Honda (28, 32).

88. The plaintiff acquires its non-Honda custom parts from Japanese sources that also act as a supplier for the defendant (23–24).

89. In 1978 and 1979, the plaintiff had $2 million in gross sales. $1 million of this figure resulted from the sale of Honda motorcycles; the other $1 million derived from the sale of non-Honda accessories (33).

91. Mr. Zegarek testified that the plaintiff's extensive implementation of custom non-Honda parts on the Honda motorcycles sold have affected the claims for warranty he makes to the defendant, even when a proper warranty claim has been submitted (41, 63–66, 187–92, 195, 247, 453).

---

**6.** These statistics reflect this Court's plenary review of the 9 deficiency reports.

**7.** Mr. Karlin testified that the information contained within these reports was accurate (501).

**8.** Mr. Zegarek testified that at the December 13, 1978 meeting, he informed defendant's counsel that for the plaintiff to remove accessories from its motorcycles would be a costly and detrimental way for Honda of Mineola to merchandise *its accessory lines* (486).

92. American Honda policy provides that if a non-Honda part "affects" the warranted Honda part, the warranty does not cover that part (456, 779, 823, Def. Ex. X).

93. Mr. Zegarek also testified that representatives of the defendant such as Mr. Tardiff (34–36, 451), Mr. Gaudreau (38), Mr. Bigerton (39, 451), Mr. Clark (39), Mr. Dean (43), Mr. Farrington (47), and Mr. Sabatini (49) expressed varying degrees of displeasure with the plaintiff's accent on non-Honda accessories. Phil Zegarek, Morris Zegarek's son and a stockholder of Honda of Mineola, echoed Mr. Zegarek's testimony in this regard in his deposition (Pl. Ex. 34).

94. In 1974, defendant's counsel wrote to Mr. Zegarek explicitly stating that "American Honda has not and will not attempt to control or limit products sold by Honda of Mineola" (450, Def. Ex. T).

95. Similarly, Mr. Farrington (806) and Mr. Sabatini (822) testified that they never told the plaintiff that it could not sell non-Honda parts and accessories.

## CONCLUSIONS OF LAW

The plaintiff's complaint challenges the propriety of the defendant's termination of its Honda franchise on two legal grounds. The first ground has its genesis in the defendant's alleged disdain for the plaintiff's extensive dealings in custom motorcycle parts manufactured by the defendant's competitors. Thus, the plaintiff initially complains that its termination as a Honda dealer is motivated by anticompetitive sentiments, which behavior constitutes a violation of sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2 (1976). On this cause of action, the plaintiff seeks treble damages.

Similarly, the plaintiff asserts that the defendant acted in bad faith and without cause when it terminated the plaintiff's Honda dealership. Thus, the plaintiff claims that the defendant contravened N.Y. Gen.Bus.Law § 197 (McKinney Supp. 1979–80) [9] which forbids the termination of any contract for the sale of new motor vehicles between a distributor and a dealer "except for cause." On this cause of action, the plaintiff seeks permanent injunctive relief.

At this stage of the instant proceedings, however, the Court need only be concerned with the plaintiff's motion for a preliminary injunction. The standards governing such a motion explicitly have been set down most recently by the Second Circuit in *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755 (2d Cir. 1979) where the court stated:

Preliminary injunctive relief in this Circuit calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*See also Seaboard World Airlines v. Tiger International, Inc.*, 600 F.2d 355 (2d Cir. 1979); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973); Mulligan, *Foreword—Preliminary Injunctions in the Second Circuit*, 43 Brooklyn L.Rev. 831 (1977). Having announced the Court's guide for the disposition of the instant motion, the necessary next step is to ascertain whether the facts

---

9. The plaintiff also has based its second claim on 15 U.S.C. § 1222 (1976) which provides:

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

This section, however, has been held not to apply to motorcycle dealers. *Small Arms Co., Inc. v. The Brooklyn Cycle, Inc.*, 408 F.Supp. 707 (E.D.N.Y.1976). As a result, this Court will not employ it in the disposition of the instant motion.

found by this Court in this matter satisfy the governing standard.

### 1. *Irreparable Harm.*

■ The "irreparable harm" component of the Second Circuit's preliminary injunction test does not present a formidable hurdle to the plaintiff in this motion. In fact, in its papers, the defendant has offered only token opposition to the plaintiff's assertion that an eventual damage award in this action would be of minimal consolation to the plaintiff in the absence of immediate equitable intervention by this Court.

The plaintiff details several elements of irreparable injury that it would suffer if this Court did not grant it preliminary injunctive relief. These include the destruction of plaintiff's dealership which provides the sole source of support for Mr. Zegarek and his family (F. 9),[9a] the eventual bankruptcy of the plaintiff's business, and the loss of the customers, location, reputation and goodwill that have contributed to the plaintiff's success (*See* F. 12). Finally, the plaintiff contends that Mr. Zegarek's advanced age of 58 years (F. 10) presents an almost insurmountable obstacle to his cultivation of a new business.

A review of the relevant case law in this circuit indicates to this Court that the threatened destruction of a business fits within the definition of irreparable harm. *See Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979); *P. J. Grady, Inc. v. General Motors Corp.*, 472 F.Supp. 35 (E.D.N.Y.1979). Accordingly, the Court concludes that the plaintiff has made a showing of irreparable harm sufficient to sustain the grant of a preliminary injunction.

### 2. *The Second Prong of the Preliminary Injunction Test*

#### A. *General Considerations*

In its termination letter of November 21, 1979 to the plaintiff, the defendant set forth 4 specific grounds for discontinuing the plaintiff's Honda dealership (F. 34).

Specifically, the defendant cited the plaintiff with (1) the submission of false claims (2) flagrant disregard for the laws of the Village of Mineola, (3) operating its business out of an unauthorized location, and (4) noncompliance with American Honda motorcycle set up procedures (*See* F. 71, 72). As noted earlier, the plaintiff's instant attack on the defendant's termination of its dealership questions both the propriety of the above cited bases for the discontinuance of the plaintiff's status, and the motive underlying the termination.

If, however, on this motion for a preliminary injunction, the Court finds it more likely than not that the defendant discontinued the plaintiff as a Honda dealer for "cause" or that the propriety of the termination of the plaintiff's franchise does not present questions of a sufficiently serious nature as to make them a fair ground for litigation, the defendant's motive becomes irrelevant. Thus, this Court initially will review the sufficiency of the business reasons cited in the November 21, 1979 termination letter before any consideration of the defendant's motive will be entertained. With respect to the set up issue, however, since the Court believes it impossible to separate the discussion of this alleged contractual violation from the plaintiff's attack on the defendant's motives, the two will be handled at the same time.

Before embarking on an analysis of the defendant's causal bases for termination of the plaintiff's dealership, a brief review of N.Y.Gen. Bus Law § 197 (McKinney Supp. 1979–80) is necessary to delineate the parameters of the Court's impending inquiry. N.Y.Gen. Bus. Law § 197 (McKinney Supp. 1979–80) was enacted in order to outlaw overreaching by large motor vehicle distributors and to "establish guidelines for enforcement of a fair and equitable balance" between the motor vehicle dealer and its distributor. 1970 N.Y. Laws ch. 582 § 1. Thus, N.Y.Gen. Bus. Law § 197 (McKinney Supp. 1979–80) permits a court asked to implement its mandate to scrutinize the reasons cited by motor vehicle distributors

---

**9a.** "F" denotes reference to the Court's Findings of Fact in this matter.

when a termination of a motor vehicle dealer occurs. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970); *P. J. Grady, Inc. v. General Motors Corp.*, 472 F.Supp. 35 (E.D.N.Y.1979); *Niagara Mohawk Power v. Graver Tank & Mfg.*, 470 F.Supp. 1308 (N.D.N.Y.1979).

■ The statutory language of § 197, however, provides little guidance to the reviewing court. The statute merely states that the court must be satisfied that "cause" supports the distributor's decision to terminate a dealer. Fortunately, however, a legislative pronouncement accompanying a 1970 revision of § 197 offers further direction. That language exhibits a legislative intent to have § 197 provide small motor vehicle dealers "judicial relief from unfair and inequitable practices affecting the public interest." 1970 N.Y. Laws ch. 582 § 1. Thus, it is safe to say that principles of fundamental fairness must guide the application of § 197 to the facts of this case. In this light, the Court turns to undertake that task.

### B. *The False Claims Issue*

Paragraph 7 of Article XIII of the Honda Motorcycle Sales Agreement (Pl. Ex. 2) states that American Honda may terminate a dealer because of:

> Submission by Dealer of any false or fraudulent application, report or statement, or false or fraudulent claim for reimbursement, refund or credit, including, but not by way of limitation, false and fraudulent warranty claims or the sale of any demonstrator or used Honda motorcycles as new and unused.

The defendant asserts that Honda of Mineola consistently engaged in the conduct condemned by the above quoted provision.

The testimony of Michael Karlin, a former service manager for the plaintiff (F. 38), provides the central source for this assertion.[10] Mr. Karlin testified before this Court that the plaintiff submitted false shipping and false warranty claims to the defendant (F. 38, 39, 49, 50). Mr. Zegarek's testimony, however, directly contraverted that of Mr. Karlin (F. 46, 47, 51, 52), as do the depositions of other individuals who have been employed by the plaintiff (F. 48).

■ The Court also has observed that Mr. Karlin's testimony was not corroborated by any other witness who testified in this Court during the lengthy hearing on this matter.[11] Nor was Mr. Karlin's testimony substantially documented by objective evidence (F. 40). Moreover, several representatives of the defendant testified that at no time did they advise the plaintiff of any belief on their part that false claims had been submitted by the plaintiff (F. 53).

Because of the extreme potential impact of Mr. Karlin's testimony, the Court must carefully examine Mr. Karlin's credibility in order to ascertain whether this Court will afford his testimony the significance the defendant suggests it deserves in its papers. Such an evaluation of credibility uniquely is within the province of this Court as the trier of fact on this motion. *General Electric Co. v. Parr Electric Co.*, 21 F.Supp. 471 (E.D.N.Y. 1937); *Rattancraft of California v. United States*, 340 F.Supp. 978 (U.S. Cust.Ct. 1972).

In assessing the credibility of Mr. Karlin, the Court has observed that Mr. Karlin's cross examination unearthed a number of factors that cast substantial doubt over the reliability of his testimony in this matter. The first of these evolves from the Court's perception of Mr. Karlin's approach to his job at Honda of Mineola and at other establishments as irresponsible (F. 41, 43). The Court also has observed that Mr. Karlin consistently has been plagued with financial difficulties (F. 42, 44).

---

**10.** Despite the importance of Mr. Karlin's testimony, Mr. Karlin's appearance as a witness for the defendant came as a complete surprise to plaintiff's counsel (497).

**11.** The defendant has attempted to corroborate Mr. Karlin's testimony with affidavits of other employees of the plaintiff. Since the deponents of these affidavits were not subject to cross examination, the Court has exercised its discretion so as not to consider these affidavits.

Similarly, the Court finds the reliability of Mr. Karlin undermined by Mr. Zegarek's testimony that he fired Mr. Karlin (F. 45). Since the bias of a witness can be considered by the trier of the facts in its determination of credibility, *United States v. Blackwood*, 456 F.2d 526 (2d Cir. 1972); *United States v. Haggett*, 438 F.2d 396 (2d Cir. 1971), the Court, in so doing, determines that the apparent dismissal of Mr. Karlin from the plaintiff's employ casts a cloud over the reliability of his damaging testimony in this action. Thus, the Court concludes that, since Mr. Karlin's testimony aptly can be described as a mode of seeking revenge for his dismissal from Honda of Mineola, the impact of such tainted testimony can not be deemed by this Court to establish a likelihood of the existence of the plaintiff's systematic submission of false warranty and false shipping claim to the defendant.

■ The defendant also characterizes the plaintiff's submission after a 1978 burglary of claims on 3 identical items to the defendant and to plaintiff's insurer (F. 55) as gross fraud sufficient to support termination of the plaintiff's Honda dealership. In this regard, the Court has taken note of the plaintiff's explanation that its conduct in this incident resulted from mere inadvertence on the part of one of its employees (F. 56). The Court finds Mr. Zegarek's explanation to be a plausible one. And, since the Court declines to characterize inadvertence as a sincere basis for termination of a motor vehicle dealership, the Court holds that this predicate for termination does not constitute "cause" as contemplated by N.Y.Gen. Bus. Law § 197 (McKinney Supp. 1979–80).

■ During the course of the hearing before this Court, the defendant also directed this Court's attention to other fraudulent practices allegedly engaged in by the plaintiff.[12] These included the sale of motorcycles in crates, a practice prohibited by American Honda. The evidence introduced with respect to these other instances of fraud, however, convinces this Court that the cited conduct evinces impropriety of an inconsequential nature, possibly warranting a reprimand, but surely not termination of the plaintiff's dealership.

Therefore, for the above stated reasons, the Court finds that on the issue of the submission of false claims, the plaintiff has established a probability of success on the merits.

### C. The Plaintiff's Relations With The Village of Mineola

As a second ground for termination, the defendant cites the plaintiff's fiery relations with the Village of Mineola. *See* F. 57, 58, 59, 68. Contending that the conduct of Mr. Zegarek provides the overriding cause for the hostile state of affairs between Mineola's residents and public officials and the plaintiff, the defendant argues that such a condition violates the Honda Dealer's Agreement (Pl. Ex. 2), and that it constitutes an unsatisfactory impairment to Honda's reputation in the Mineola community.

Contrary to the defendant's depiction of the reasons for the hostility between the plaintiff and the representatives of Mineola, the evidence educed at the hearing before this Court tended to show that much of Mineola's dismay with the plaintiff's operations stems from the apparent incompatibility of a motorcycle business and a neighboring residential community. The testimony of Mineola's Mayor and of Mr. Zegarek bears this out. Both of these witnesses observed that the animosity of the Mineola residents toward the plaintiff evolves primarily from their fears of the violent, black leather jacket image of the motorcycle consumer, and of the noise and activity attendant to the plaintiff's business (F. 69, 70).

Moreover, it appears that the fears of the Mineola residents have been translated into a legal campaign by the public officials of Mineola to make the plaintiff's existence in Mineola a difficult one.[13] Since 1971, the

---

12. *See* note 4 *supra.*

13. This is evidenced by the passage of laws designed to impede the plaintiff's business (F.

65). Some of these laws have been found to be outside the jurisdiction of the Village (F. 67).

Village has cited the plaintiff for numerous violations of local ordinances arising from the operation of its facilities at 336 Jericho Turnpike, 344 Jericho Turnpike and 255 Jericho Turnpike; the plaintiff has prevailed in the overwhelming majority of these cases that have reached the local courts (F. 60, 61, 62, 63, 64, 66).

■ Thus, the facts surrounding the plaintiff's difficulties with the Mineola community shed an explanatory light on their existence. It is this Court's opinion that, in this light, the persuasiveness of the defendant's claim that the plaintiff's relations with the Village of Mineola constitute cause for termination of the plaintiff's dealership diminishes dramatically. As a result, this Court concludes that the plaintiff has established a probability of success on its refutation of the defendant's claim that its relations with the Mineola community is cause for termination of its dealership. In reaching this conclusion, the Court has taken into account the fact that Mr. Zegarek's somewhat abrasive independence has occasioned some of his problems with the Mineola community. But, the Court also believes that Mr. Zegarek's approach to community relations is but a reaction to the community's bitter attitude towards him and his business. Sitting in equity, this Court cannot countenance the termination at this time of a man's business under such attenuated circumstances.

### D. The Plaintiff's Use of 344 Jericho Turnpike

Section 1 of Article III of The Honda Motorcycle Sales Agreement (Pl. Ex. 2) provides:

> To provide proper Honda Motorcycle and Honda Motorcycle Parts representation commensurate with the reputation and goodwill attached to the name "Honda" and to facilitate the proper sales and servicing of Honda Motorcycles and Honda Motorcycle Parts, Dealer will maintain business premises satisfactory to Distributor with respect to appearance, location, size of buildings and adequate layout as well as equipment, showroom, office, storage space, workshop and service operation; the whole which shall be adequate for the sale and service of Honda Motorcycles and Honda Motorcycle Parts in proportion to the number of Honda Motorcycles and Honda Motorcycle Parts that may reasonably be expected to be sold and serviced by Dealer in Dealer's Primary Area of Responsibility, and possible expansion of the premises to handle any foreseeable future requirements.

Furthermore, Section 3 of Article III of the agreement provides:

> Once a Dealer has established its business facilities or location mutually satisfactory to Dealer and Distributor, Dealer will not move to or establish a new or different location, branch sales office or branch service establishment without first obtaining a written approval of Distributor.

In its termination letter of November 21, 1979, the defendant cited a violation of the above quoted sections as a ground for termination of the plaintiff's dealership.

This alleged violation stems from the plaintiff's transfer of its entire operation from 336 Jericho Turnpike to 344 Jericho Turnpike after the September 20, 1979 fire (F. 8, 20). The defendant claims that 344 Jericho Turnpike is not a satisfactory motorcycle sales and service facility, and that the plaintiff moved to and established its business at 344 Jericho Turnpike without receiving the required written approval from the defendant. Thus, the defendant views the plaintiff's transfer to 344 Jericho Turnpike to be an act in derogation of the controlling agreement.

In opposition, the plaintiff asks this Court to extend to it an equitable license to operate out of 344 Jericho Turnpike until it can return to its resurrected facility at 336 Jericho Turnpike. Thus, the plaintiff argues that it began full scale operations out of 344 Jericho Turnpike solely out of necessity due to the destruction of the 336 Jericho Turnpike facility.

In reviewing these contentions, the Court must keep in mind that, on this motion for a preliminary injunction, it sits in equity and must be cognizant of the need, when circumstances so dictate, to take appropriate interim action. *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356 (2d Cir. 1976); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953). This Court took such an approach to the issue of the plaintiff's temporary use of 344 Jericho Turnpike on December 3, 1979 when it recognized the plaintiff's entitlement in equity "to some reasonable length of time to recover [its] business and to put that business back into the position it previously was in ... [before] the fire completely destroyed the [336 Jericho Turnpike facility]." *Transcript of December 3, 1979 Proceedings Before This Court*, p. 19. After reviewing the testimony elicited at the lengthy hearing before this Court, the Court is of the opinion that a similar approach must govern the Court's disposition of this issue on this motion.

Several factors militate in favor of such a finding at this time. The first of these is Mr. Zegarek's substantial efforts in good faith to conform 344 Jericho Turnpike's specifications to Honda's service and sales requirements (F. 21). On the basis of the testimony on this score considered by this Court, it appears that these improvements have made 344 Jericho Turnpike's facilities comparable to those of other Honda dealers on Long Island (F. 22, 23).

While improving 344 Jericho Turnpike, the plaintiff has participated in efforts to rebuild 336 Jericho Turnpike (F. 63). Since the plaintiff procured insurance on the 336 Jericho Turnpike facility (F. 19), and has always maintained a good financial record (F. 11), the Court concludes that the resurection of 336 Jericho Turnpike more closely resembles a reality than an idle hope. Under this circumstance, the necessity of interim operations at 344 Jericho Turnpike for the plaintiff intensifies. If the plaintiff cannot operate temporarily while 336 Jericho Turnpike is being reconstructed, a strong possibility exists that the customers, goodwill and reputation of the plaintiff will diminish to such a level as to make the resumption of business at 336 Jericho Turnpike when it is rebuilt economically unfeasible. Since the Court's analysis of the previously discussed bases for termination makes it more likely than not that the plaintiff eventually will prevail on the injunctive phase of this action, this Court concludes that it would be manifestly unfair to cut off the plaintiff's chance to rebuild a viable business to its prior confines.

Another factor favoring the plaintiff is its prior use of 344 Jericho Turnpike in connection with its Honda operation (F. 13, 15). This Court concludes that the testimony it heard supports a finding that representatives of the defendant familiar with the plaintiff's operation knew of the plaintiff's previous use of 344 Jericho Turnpike (F. 18), although the extent of such use is disputed (F. 16). Moreover, the plaintiff's lease for 344 Jericho Turnpike contains a provision relating to motorcycle sales, storage and service (F. 14). Thus, this Court concludes that, as a result of the tragic fire at 336 Jericho Turnpike, the plaintiff's temporary transfer of operations to 344 Jericho Turnpike, a location it already utilized, can be sanctioned as a necessary reaction to an emergency, a reaction to which the defendant reasonably should be expected to adjust.

This Court understands the importance of motorcycle safety which the defendant points to as its primary reason for objecting to the plaintiff's transfer to 344 Jericho Turnpike. In dramatic terms, however, Mr. Zegarek professed similar concerns (F. 73). Accordingly, in not characterizing the plaintiff's interim use of 344 Jericho Turnpike as "cause" for termination of the plaintiff's dealership for the limited purpose of this motion for a preliminary injunction, this Court is in no way expressing approval of unsafe motorcycle operations. The Court is convinced that the plaintiff's interim operation out of 344 Jericho Turnpike will evince the high regard for safety to which Mr. Zegarek testified. And, the Court expects American Honda, as the national distributor

of Honda motorcycles, to ensure that the plaintiff's operations at 344 Jericho Turnpike will conform to *reasonable* facility requirements. Therefore, with this caveat, the Court concludes that the plaintiff has established a probability of success on the issue of the propriety of its temporary use of 344 Jericho Turnpike for its Honda dealership in Mineola, N. Y.

### E. *Motorcycle Set Up at Honda of Mineola*

Paragraph 12 of Article XIII of the Honda Motorcycle Sales Agreement (Pl. Ex. 2) states that a dealer may be terminated because of:

> Failure of Dealer to perform the required set-up and pre-delivery inspection, repairs and services and procedural requirements relating thereto.

Using this section as a sword in this action, the defendant contends that the magnitude of the plaintiff's set up deficiencies constitutes cause for termination of the plaintiff's dealership.

Plaintiff's Exhibit 8 provides the prime objective indicia of the plaintiff's set up record. This Exhibit details 187 separate deficiencies on 114 display motorcycles (F. 76, 77). The defendant introduced evidence attempting to prove that this number of deficiencies placed the plaintiff as the worst dealer in the Honda chain with respect to set up (F. 780),[14] and that the plaintiff's manner of set up has been a constant headache to American Honda (F. 80, 81, 82, 83, 84).

The plaintiff has countered this attack on its set up record by arguing that many of the cited deficiencies, in fact, are not deficiencies at all. Instead, the plaintiff asserts that 108, or over 50% of the cited deficiencies, are the result of its extensive trafficking in custom non-Honda parts, *see* F. 87, 88, 89, 90, at its Honda dealership (F. 85, 86). The plaintiff also asks this Court to observe that, of the remaining 79 deficien-

cies, 22 of these involve the minor mishap of dirty motorcycle seats. Finally, and most importantly, the plaintiff contends that the remaining 57 deficiencies are *de minimus* when measured against the large number of motorcycles sold by the plaintiff. *See* F. 12. Therefore, the plaintiff asks this Court to conclude that this insignificant number of deficiencies does not provide a causal basis for termination of its dealership. Acceptance of this argument, however, would require this Court to adopt the predicate upon which the argument rests. That predicate includes a serious attack on the bona fides of the defendant.

Accordingly, this Court concludes that the defendant's attack on the plaintiff's manner of motorcycle set up, and the plaintiff's antitrust claim which questions the motive behind such an attack are inextricably interwoven. This being so, the Court will treat these two issues as an entity.

Essentially, plaintiff's antitrust claim alleges that the defendant's anticompetitive motive has resulted in the termination of its dealership. Simply stated, the plaintiff asserts that its extensive dealings in *non*-Honda parts and accessories and its resultant eschewal of Honda parts and accessories constitute the true reason for its termination. The plaintiff's dealings in non-Honda parts and accessories make up over 50% of its gross sales (F. 89, 90).

At the hearing before this Court on the instant motion, the plaintiff introduced a great deal of evidence designed to prove that anticompetitive motives led to its termination, and that the other claimed maladies in its operation merely served as a screen to shield the defendant's illegal motive. In this regard, Mr. Zegarek pointed to nagging warranty problems with the defendant allegedly tied to the mere implementation of non-Honda parts in Honda motorcycles (F. 91). Mr. Zegarek and his son[15] also testified that representatives of

---

**14.** Plaintiff's counsel's cross examination of Mr. Keller, a witness called by the defendant, substantially questioned the basis for Mr. Keller's conclusion that the plaintiff's deficiency record placed it as the worst in the Honda chain (F. 79).

**15.** Mr. Zegarek's son did not testify before this Court; he did, however, submit to a deposition at which a representative of the defendant was present (Pl. Ex. 34).

the defendant had expressed varying degrees of displeasure with the plaintiff's massive foray into the sale of non-Honda parts (F. 93).

Understandably, the defendant vehemently has denied the plaintiff's antitrust accusations. The evidence presented in this connection has taken the form both of documentary evidence, albeit rather ancient (F. 94), and of testimony from representatives of the defendant (F. 95). After careful consideration of this evidence in contradistinction to that presented by the plaintiff, the Court declines to opine as to whether the plaintiff or the defendant has demonstrated a probability of success on the merits of either the set up or the antitrust issue. This conclusion, however, does not complete the Court's preliminary injunction inquiry on these intertwined issues. This is so because the Court next must consider whether these issues present sufficiently serious questions concerning the defendant's motive to make them a fair ground for litigation, and whether the balance of hardships tips decidedly toward the party requesting the preliminary relief.

■ In *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977), the Second Circuit explained that, in an antitrust context, the "sufficiently serious question" standard is satisfied if the plaintiff raises substantial questions regarding the existence of antitrust violations. *Id.* at 443. *See also Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953). Therefore, in order to satisfy this standard in this matter, the Court must acknowledge at least the inference that the plaintiff's dealership termination resulted because of its competition with the defendant in the accessory market. *See* 548 F.2d at 444. It is this Court's opinion that such an anticompetitive inference is cognizable from the facts presented to this Court.

In reaching this conclusion, the Court relied heavily upon its impression that the evidence set forth by the plaintiff at the lengthy hearing before this Court raised substantial questions regarding the bona fides of the defendant with respect to its relations with the plaintiff. Specifically, the Court deems the possibility of an unarticulated but subtle design of the defendant to lessen the plaintiff's emphasis on the sale and installation of non-Honda parts to be of a sufficiently serious nature as to warrant litigation over it. The ongoing dispute over set up attests to this possibility.

In this regard, the evidence concerning the defendant's reaction to the plaintiff's forced transfer of its operations to 344 Jericho Turnpike after the September 20, 1979 fire must be considered. While Mr. Zegarek testified that he received verbal approval from certain representatives of the defendant concerning his transfer of the plaintiff's operation to 344 Jericho Turnpike (F. 27, 28), these representatives testified that they never officially recommended that the 344 Jericho Turnpike location be approved. Notwithstanding this conflicting testimony, it is clear to this Court that for the *six weeks* preceding the formal termination of the plaintiff's dealership, the defendant left the plaintiff in limbo by cutting off access to all essential Honda parts and tools (F. 24, 31), without clearly informing the plaintiff of its status (F. 25, 26). This conduct severely injured the plaintiff's business (F. 32, 33). To this Court, such conduct evinces bad faith on the defendant's behalf toward a dealer with whom relations had been carried on for over 15 years. This mala fides tips the equitable scale in the plaintiff's favor, while serving to raise serious questions as to the motive underlying the termination of the plaintiff's dealership.

■ As for the "balance of hardships" prong of the test, this Court's prior conclusion that the plaintiff will sustain irreparable harm in the absence of equitable intervention by this Court goes a long way towards satisfying this requirement. *New York v. Nuclear Regulatory Commission,*

**822**

550 F.2d 745 (2d Cir. 1977); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356 (2d Cir. 1976). Moreover, this Court is convinced that this potential irreparable injury to the plaintiff is substantially greater than the hardship the defendant would suffer by being required to continue the plaintiff as a Honda dealer during the pendency of a preliminary injunction. In short, the Court finds that the balance of hardships in this matter tips decidedly toward the plaintiff who, in the absence of preliminary relief, would lose its business, its location, its reputation and its goodwill.

Therefore, for the foregoing reasons:

(1) The Court concludes that the plaintiff has made a sufficient showing of irreparable harm.

(2) The Court concludes that the plaintiff has demonstrated a likelihood of success on the false claims issue, on the issue of the plaintiff's relations with the Village of Mineola and on the issue of the plaintiff's use of 344 Jericho Turnpike.

(3) The Court concludes that the plaintiff's antitrust claim and the set up issue present sufficiently serious questions going to the merits as to make them a fair ground for litigation and that the balance of hardships tips decidedly in the plaintiff's favor.

Accordingly, the plaintiff's motion for a preliminary injunction is hereby GRANTED in all respects.

It is SO ORDERED.